# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00752-CV

**Armando Sanchez, M.D., Appellant**

**v.**

**Texas State Board of Medical Examiners and Donald W. Patrick, M.D., Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT
## NO. GN400982, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING

## O P I N I O N

Appellant Armando Sanchez, M.D., appeals the district court's final judgment affirming the order of the Texas State Board of Medical Examiners[1] revoking Sanchez's medical license and imposing an administrative penalty and costs. This disciplinary action was predicated upon fact findings that Sanchez had solicited the murder of a former patient. In six issues on appeal, Sanchez contends that the administrative law judge committed evidentiary and procedural errors in finding that Sanchez had solicited the former patient's murder; that substantial evidence did not support those fact findings; that such findings, if proper, were not legally sufficient support for the statutory ground under which discipline was imposed; and that the Board erred in making certain changes to the administrative law judge's proposal for decision. We will affirm the district court's judgment.

---

[1] Appellee Donald W. Patrick, M.D., is the Executive Director of the Board.

## BACKGROUND

Prior to the disciplinary proceedings from which this appeal arose, Sanchez held a license to practice medicine issued by the Board. Sanchez practiced industrial medicine, involving workers' compensation claims. He had practiced in the Houston area since 1987.

In connection with a worker's compensation claim, Dr. Sanchez had assessed one of his patients, M.G., with an 8% impairment rating. In a subsequent independent medical examination, M.G. was assessed only 4% impairment. The Texas Workers Compensation Commission adopted the 4% recommendation, which had the effect of reducing the amount of M.G.'s benefits. M.G., for whatever reason, was angered at Dr. Sanchez. Sanchez testified that M.G. came to his office and threatened to kill Sanchez, his family, his staff, and his staff's families. Later, at an evening social gathering at a house Sanchez owned, M.G. appeared unexpectedly at the front door at a late hour—it was unknown how M.G. learned of the gathering or that Sanchez would be there—again threatened Sanchez and his family, stated that he knew where Sanchez lived, and mentioned descriptive details of Sanchez's home and family. Sanchez deduced that M.G. had been stalking him and his family.

A friend of Sanchez who was also present at the gathering, Tony Sappington, a chiropractor with some martial arts experience, initially voiced eagerness, before others restrained him, to "whip his [M.G.'s] butt and throw him in the backyard," and (at least figuratively) "bury him." (We note this remark because it is relevant to some disputed facts we discuss below). Later that evening, Sappington, perceiving that Sanchez feared for his and his family's safety, loaned Sanchez a shotgun and suggested that he seek advice from some of the police officers who were

2

among their patients. Sappington offered to introduce Sanchez to Houston Police Department officer Glen Hill, who was married to Sappington's cousin and had immediate family who were his frequent patients.

Sappington arranged for Officer Hill to meet with Sanchez at Sappington's office on Friday, October 6, 2000. Exactly what transpired at this meeting is disputed. Hill, Sappington, and Sanchez each testified at the disciplinary hearing. All agreed that Hill showed up in police uniform; that Sappington introduced Sanchez to Hill and left at some point thereafter to attend to patients; that Sanchez explained his problems with M.G.; and that Hill made notes of the information, explained the process for filing a complaint, and assured him that HPD would get to work on the matter. It is also undisputed that at some point, Sanchez, who originally was from Mexico, mentioned that he had a brother who was a Federale—an officer in the Mexican federal police force—and made a remark to the effect that in Mexico, one could pay a Federale to "take care" of the likes of M.G., and alluded to drinking beer on M.G.'s grave.

Officer Hill recounted that Sanchez made this remark while the pair was alone, in response to Hill's explanation of the procedures for filing a police report and other lawful means of obtaining protection from M.G. According to Hill, Sanchez "said he didn't want anything like that done, that he had a brother who was a Federale in Mexico and that if this was in Mexico that that night he would be drinking a beer on top of the patient's grave." This confused Hill, so he asked Sanchez what the doctor wanted him to do, and Sanchez responded by suggesting that Hill could get a gun, held his hand up as if pointing a gun, and said "boom, boom, boom." Hill interpreted Sanchez's remarks to mean that he wanted M.G. killed. Hill claimed that he was "shocked,

3

surprised," and began looking around the room for a camera, wondering if he was being "set up." He told Sanchez that he "had to think about it," and left the meeting. Hill testified that there was no doubt in his mind that he was being asked to kill M.G.

Sanchez and Sappington, by contrast, each testified that Sanchez made the Federale remark while Sappington was still present, following an exchange in which mention was made of Sappington's initial remarks about beating up M.G. and burying him in the backyard. Hill allegedly responded to the effect that "you don't bury them . . . [y]ou always burn them." Sappington characterized all of these remarks as in jest. Sanchez, on the other hand, recalled that Hill made an additional comment, which Sanchez found "pretty disturbing," to the effect that this was why burned, abandoned cars were sometimes found on freeways with bodies inside, so there wouldn't be "a trace of it." According to Sanchez, Hill then stated, "[W]ell, we're not going to kill anyone," which Sanchez interpreted as Hill "kind of impl[ying] some kind of maybe." To this, Sanchez claims that he responded to the effect that if he wanted M.G. killed, he would call his brother the Federale, that Federales "are basically assassins," and that he was sure that his brother would "even be drinking beer on top of [M.G.'s] grave." Sanchez denied pointing his finger like a gun and making the "boom, boom, boom" remark.

Dr. Sanchez added that when he raised the idea of his contacting a local constable to make a report, Officer Hill dismissed the idea, suggesting that at most, M.G. would get arrested, get out on bail, kill Dr. Sanchez, and flee to Mexico. According to Sanchez, Hill assured him that he would "take care of" the problem because he was Sappington's friend, and would call Sanchez later. Sanchez professed that "[o]bviously, my impression was that he [Hill] was going to help me out in

4

some way [but] I didn't know what he meant." Sanchez further testified that Hill told him not to divulge anything to Sappington, and it is undisputed that both men left the office without talking to Sappington.

Hill immediately reported his perception of the conversation to his superiors at the Houston Police Department. They decided that Hill should investigate the matter, and he was given an unmarked patrol car equipped with microphones and transmitting equipment for recording conversations. Arrangements were also made to record telephone calls between Hill and Sanchez. Between October 6 and 9, 2000, HPD recorded seven telephone and in-person conversations between Dr. Sanchez and Officer Hill. Over objection, what purported to be copies of the recorded conversations were admitted into evidence, as well as transcriptions of those recordings.

It is undisputed that during this period, Dr. Sanchez met with Officer Hill several times in his unmarked patrol car in various Houston restaurant parking lots, that Sanchez agreed to pay Hill for purposes including buying an unregistered gun, and that Sanchez actually delivered $8,000 to Hill. However, Hill and Sanchez offer differing interpretations of their meetings and conversations. Hill understood that Sanchez was hiring him to kill M.G. Sanchez insisted that he was hiring Hill to resolve the M.G. problem through some unspecified means that he vaguely understood as possibly including having M.G. arrested and deported, intimidated, or bought off—but that never included killing him. In fact, it is undisputed that Sanchez never used a term such as "kill" or "murder" to describe the act he intended Hill to commit, though there was evidence that Hill did so repeatedly and without correction, clarification, or question from Sanchez.

During the afternoon of October 6, Officer Hill called Dr. Sanchez, according to Hill,

5

and informed him that he was "interested in doing what he had asked me to do and we needed to talk about it." Hill stated that, without a doubt, Sanchez commented that he thought Hill needed to get a gun. The pair agreed to meet later that day at a local restaurant and it is undisputed that, at the appointed time and place, Sanchez got into Hill's unmarked car. Hill testified that the pair discussed the need not to divulge their dealings to Sappington or other third parties. According to Hill, Sanchez indicated that he and Sappington were planning to ride motorcycles and go out that evening and would be "visible," which Hill interpreted as the construction of an alibi. Hill also claimed that Sanchez urged him to commit the act that evening. Hill recounted that he offered a price of $20,000, "half before the act and then half after," explaining that he would need money to obtain an unregistered gun, and Sanchez ultimately resolved to pay that amount. Hill added that the pair discussed when Sanchez could get the cash from his bank and whether Sanchez would want proof of the act before his second payment. Hill emphasized that Sanchez assured him that he was "sure, 100 percent sure" that he wanted the act done.

Sanchez testified that Hill called him later that evening "[b]asically to follow up" on their earlier meeting. Hill did not testify regarding any such conversation, and it was not among those that were recorded. Sanchez recounted that Hill stated: "Something in relation that he's probably going to have a—use a different gun to have to use. He needed some money because he wanted to maybe give some money to the guy to get away from my life. He also—it is hard for me to remember exactly what it was, but from what I can recall, something along the lines of he may have to . . . need to pay some friends or whatever to—I didn't go into particulars with him—to be able to intimidate the gentleman, maybe call Immigration Department. I don't know. I don't know.

6

I don't know exactly what he meant, but that's what he said."

The following morning, Officer Hill called Dr. Sanchez. According to Hill, he informed Sanchez that he was unable to commit the act the previous night because of the weather, and inquired whether Sanchez still wanted him to go forward. It is undisputed that the pair agreed to meet again, and did meet again in Hill's car at the same location as the previous day. Hill testified that Sanchez agreed to get $8,000 from his bank that day so Hill could buy a gun. Hill added that during this conversation, he explicitly mentioned "killing" M.G. at least three times and that Sanchez never interrupted him to say that he didn't want M.G. killed or that Hill had misunderstood him. Sanchez, on the other hand, admitted that Hill had asked him for money but testified that "I think he was going to get some stuff, including a gun to intimidate [M.G.]"

After the meeting, Sanchez admits, "I went to the bank and . . . got the money," and reunited with Hill in the parking lot of a different restaurant. It is undisputed that Sanchez gave Hill the money; Hill recalled receiving "a big wad of US currency in $100 bills." Hill testified that he asked Sanchez whether he was "sure," and Sanchez responded, "One-way ticket." Hill asked, "One-way ticket? For me?" Sanchez, according to Hill, responded, "No. For your gun." Hill claimed he then asked Sanchez whether he wanted Hill to kill M.G., to which Sanchez reiterated, "One-way ticket." Sanchez, Hill added, assured Hill that he was "very sure," and sure "100 percent," as Sanchez didn't have a choice and would not be able to forgive himself if M.G. harmed his children. Hill also asserted that he invited Sanchez to call his pager if Sanchez changed his mind about having M.G. killed, to which Sanchez responded, "No, no, go on. . . . Move forward as fast as you can." Sanchez later acknowledged alluding to a "one-way ticket," but insisted that he understood the

7

remark to refer to a bus ticket to transport M.G. back to Mexico.

On Monday, October 9, Hill called Sanchez and arranged another meeting later that day at the same restaurant parking lot as their last meeting. Hill testified that at this meeting he told Sanchez that his problem had been taken care of the previous evening and that Hill just needed "to get a little more money from him." Sanchez, according to Hill, inquired whether Hill had a picture, but did not insist on seeing one. Hill added that Sanchez explained that he could not get the remainder of the money that day because the banks were closed for Columbus Day, but could do so the following day.

After Sanchez departed the meeting, he was arrested by HPD personnel and subsequently charged with solicitation of capital murder. However, prosecutors later offered, and Sanchez accepted, a plea bargain whereby he pleaded nolo contendere to the charge of solicitation of capital murder and the district court entered an order of deferred adjudication, sentencing Sanchez to ten years' community supervision, a $5,000 fine, forfeiture of the $8,000 that he paid Officer Hill, and 500 hours of community service.[2]

## PROCEDURAL HISTORY

Subsequently, the Board docketed a formal disciplinary complaint against Dr. Sanchez. The Board alleged two grounds upon which it sought to impose discipline: (1) Sanchez's being "convicted" of a felony, *see* Act of May 13, 1999, 76th Leg., R.S., ch. 388, § 1, 1999 Tex. Gen. Laws 1431, 1517 (amended 2003) (current version at Tex. Occ. Code Ann.

---

[2] The court also ordered Dr. Sanchez not to have any contact with M.G.

§ 164.051(a)(2)(A) (West 2004)); and (2) Sanchez's committing the "prohibited practice" of "unprofessional conduct that is likely to deceive or defraud the public, as provided by Section 164.053, or injure the public." *See* Tex. Occ. Code Ann. §§ 164.051(a)(1) (West 2004), .052(a)(5) (West Supp. 2006). The complaint was referred to the State Office of Administrative Hearings, and a hearing was held before an administrative law judge (ALJ) in June 2003.

Based on the evidence summarized above, as well as the tapes and transcripts of Officer Hill's conversations with Dr. Sanchez, the ALJ made the following findings of fact that are relevant to this appeal:

7. During this [initial October 6, 2000] meeting between Dr. Sanchez and Officer Hill, Dr. Sanchez indicated to Officer Hill that he wanted M.G. killed. Officer Hill told Dr. Sanchez that he had to think about his request and would contact Dr. Sanchez later.

. . . .

10. Officer Hill's testimony and the tape recorded conversations between Dr. Sanchez and Officer Hill establish by a preponderance of the evidence that Dr. Sanchez solicited Officer Hill to kill M.G.

11. Dr. Sanchez agreed to pay Officer Hill $20,000 to kill M.G. On October 7, 2000, Dr. Sanchez paid Officer Hill $8,000 cash as a partial payment of the agreed price. Dr. Sanchez agreed to pay Officer Hill the balance of $12,000 after M.G. was killed.

12. Dr. Sanchez solicited Officer Hill to murder M.G.

The ALJ concluded that Dr. Sanchez's order of deferred adjudication was not a "conviction" that could support discipline under the then-applicable version of section 164.051(a)(2)(A). The ALJ also rejected the Board's argument that the evidence supported a conclusion that Dr. Sanchez "commit[ed] unprofessional or dishonorable conduct that is likely to

9

deceive or defraud the public, as provided by Section 164.053 . . . ." *See id.* § 164.052(a)(5). The ALJ observed that section 164.053 defines "unprofessional or dishonorable conduct likely to deceive or defraud the public" to include, in relevant part, commission of "an act that violates any state or federal law if the act is *connected with the physician's practice of medicine*," but provides that "[p]roof of the commission of [such] act while *in the practice of medicine or under the guise of the practice of medicine* is sufficient for the board's action." *Id.* § 164.053(a)(1), (b) (West 2004) (emphases added). The ALJ reasoned that this statutory structure required the Board to establish not only that Sanchez's acts were "connected with" his practice of medicine, but were undertaken "while in the practice of medicine or under the guise of practicing medicine." Reasoning that the evidence did not establish this disciplinary ground as the Board had construed it, the ALJ declined to make findings and conclusions to support that ground. However, in its conclusion of law 5, the ALJ stated that "Dr. Sanchez's solicitation of murder of M.G. did not occur while Dr. Sanchez was engaged in the practice of medicine, as that term is defined in Tex. Occ. Code § 151.002(a)(13)."[3]

However, the ALJ did conclude that the Board could discipline Dr. Sanchez for "unprofessional or dishonorable conduct likely to . . . *injure* the public." *See id.* §§ 164.051(a)(1), .052(a)(5) (emphasis added). The ALJ reasoned that unlike "unreasonable or dishonorable conduct likely to *deceive or defraud* the public," a category of acts explicitly limited by section 164.053 and its requirement that criminal acts be "connected with the physician's practice of medicine,"

---

[3] That provision defines "practicing medicine" as "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions, . . ." Tex. Occ. Code Ann. § 151.002(a)(13) (West Supp. 2006).

10

"unreasonable or dishonorable conduct likely to . . . *injure* the public" is subject to no such limitation. In this connection, the ALJ made finding of fact 18 that "Dr. Sanchez's conduct was likely to result in the death of M.G. and, thus, was likely to injure the public," and the following conclusions of law:

3. Based on Finding of Fact No. 12, Dr. Sanchez committed unprofessional and dishonorable conduct that was likely to injure the public, in violation of Tex. Occ. Code § 164.052(a)(5).

4. Tex. Occ. Code § 164.051 and 164.52(a)(5) authorize the Board to discipline Dr. Sanchez for his unprofessional and dishonorable conduct that was likely to injure the public.

In its final order, the Board adopted all of the proposed findings of fact and conclusions of law except for conclusion of law 5 ("Dr. Sanchez's solicitation of murder of M.G. did not occur while Dr. Sanchez was engaged in the practice of medicine, as that term is defined in Tex. Occ. Code § 151.002(a)(13)"), and conclusions of law 9, 10, and 11, in which the ALJ stated that the Board "should" revoke Dr. Sanchez's medical license, impose a $5,000 administrative penalty, and impose a $1,480.35 fee to cover the cost of the transcript. Regarding its decision to delete conclusion of law 5, the Board stated:

(1) the Complaint in this matter did not allege and the Board Staff did not attempt to prove that Dr. Sanchez's solicitation of murder occurred while Dr. Sanchez was actually engaged in the practice of medicine. That was never an issue in this case. Therefore, this Conclusion is not an issue that should be determined by the Board.

(2) this Conclusion of Law is not necessary to support the Conclusion of Law No. 3, stating that Dr. Sanchez committed unprofessional and dishonorable conduct that was likely to injure the public. That Conclusion of Law is sufficient to impose on this Board the duty to take disciplinary action against Dr. Sanchez.

11

(3) this Conclusion could be interpreted as adopting the ALJ's reasoning, as stated on page 28 and 29 of the Proposal for Decision, that Section 164.053(a)(1) of the Act requires not only a showing that the improper conduct could be "connected with the physician's medical practice," as required by the statute, but also that the act must occur "in the practice of medicine or under the guise of the practice of medicine." The Board declines to adopt this reasoning as the policy of the Board.

Since it is unnecessary for the Board to make such a Conclusion of Law in this matter, the Board has determined that this Conclusion of Law should be deleted from the Final Order.

*See* Tex. Gov't Code Ann. § 2001.058(e) (West 2000).

The Board adopted all of the ALJ's recommendations for sanctions stated in conclusions of law 9, 10, and 11, but formally deleted these conclusions because they were, in the Board's view, "in actuality recommendations . . . rather than conclusions of law."[4]

Sanchez sought judicial review of the Board's order in district court. After a hearing on the merits, the district court rendered a final judgment affirming the Board's final order. This appeal followed.

## DISCUSSION

The six issues that Dr. Sanchez brings on appeal can be divided into essentially two groups. In his first set of issues, Sanchez complains of legal error in connection with the Board's four findings of fact that he solicited M.G.'s murder. Specifically, he urges that the ALJ abused its discretion in admitting copies and transcripts of the HPD recordings of his conversations with Officer Hill, that the ALJ erred in applying a preponderance-of-the-evidence rather than a higher

---

[4] The Board emphasized that it "is charged with the duty and has the sole authority to make the final decision in this matter, and that includes the decision as to the appropriate sanctions."

12

burden of proof, and that the findings are not supported by substantial evidence.[5]

Dr. Sanchez's second set of issues challenges whether the findings of fact that he solicited M.G.'s murder can, as a matter of law, support the disciplinary ground that he "commit[ted] unprofessional or dishonorable conduct that is likely to . . . injure the public" under section 164.052(a)(5) without additional findings or conclusions that those acts were committed within or "under the cloak of" the practice of medicine.[6] Related to this question, Sanchez complains that the Board improperly omitted the ALJ's conclusion of law 5.[7]

**Admission of the recordings and transcripts**

We first address Dr. Sanchez's assertion that the ALJ abused its discretion in admitting copies of the HPD tape recordings of his conversations with Officer Hill and transcriptions of those recordings, and that such admission was harmful. Although he states this argument in terms of the "best evidence" rule,[8] Sanchez's ultimate complaint is that the Board failed to lay a sufficient foundation that either the original or duplicate audiotapes were authentic.

---

[5]  Sanchez's fifth, third, and second issues, respectively.

[6]  On this basis, Sanchez's first issue challenges the Board's conclusion that he violated section 164.052(a)(5) of the occupations code. Similarly, Sanchez urges in his sixth issue that the Board acted arbitrarily and capriciously and abused its discretion by failing to "consider the requirement that the alleged act be within the practice of medicine," and thus "did not consider the factors that were relevant to its decision and considered irrelevant factors." An agency decision may be found arbitrary and capricious if it is based on legally irrelevant factors or if legally relevant factors were not considered. *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994); *Centerpoint Energy Houston Elec., LLC v. Public Util. Comm'n*, 212 S.W.3d 389, 400 (Tex. App.—Austin 2006, pet. abated).

[7]  His fourth issue.

[8]  *See* Tex. R. Evid. 1002, 1003.

13

*See* Tex. R. Evid. 901.

We review administrative rulings regarding the admissibility of evidence under the same abuse-of-discretion standard that we apply to trial courts. *Austin Chevrolet, Inc. v. Motor Vehicle Bd.*, 212 S.W.3d 425, 432 (Tex. App.—Austin 2006, pet. denied); *City of Amarillo v. Railroad Comm'n*, 894 S.W.2d 491, 495 (Tex. App.—Austin 1995, writ denied). The test for abuse of discretion is whether the ruling was unreasonable or arbitrary or made "without reference to any guiding rules or principles." *Cire v. Cummings*, 134 S.W.3d 835, 839 (Tex. 2004) (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241 (Tex. 1985)); *Sheshunoff v. Sheshunoff*, 172 S.W.3d 686, 701 (Tex. App.—Austin 2005, pet. denied).

Under rule 901, the requirement of authentication "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Tex. R. Evid. 901(a).[9] Such evidence may include testimony by a witness with knowledge that a matter is what it is claimed to be and identification of a voice by opinion based on hearing the voice under circumstances connecting it with the alleged speaker. *Id*. 901(b)(1), (5). Further, the predicate for admissibility under rule 901 may be proven by circumstantial evidence. *See Wallace v. State*, 782 S.W.2d 854,

---

[9] Sanchez complains that the Board failed to introduce evidence meeting the seven-part predicate for the admission of recordings stated in *Cummings v. Jess Edwards, Inc.*, 445 S.W.2d 767 (Tex. Civ. App.—Corpus Christi 1969, writ ref'd n.r.e.): (1) a showing that the recording device was capable of taking testimony; (2) a showing that the operator of the device was competent; (3) establishment of the authenticity of the correctness of the recording; (4) a showing that changes, additions, or deletions have not been made; (5) a showing of the manner of the preservation of the recording; (6) identification of the speakers; and (7) a showing that the testimony elicited was voluntarily made without any kind of inducement. *Id*. at 773. However, the *Edwards* criteria did not survive the adoption of rule 901 of the rules of evidence. *Angleton v. State*, 971 S.W.2d 65, 69 (Tex. Crim. App. 1998).

14

856-57 n.6 (Tex. Crim. App. 1989).

The ALJ admitted the tapes in the belief that Officer Hill had testified that the tapes and transcript were accurate representations of his conversations with Dr. Sanchez. The record is not a model of clarity in that regard. Officer Hill was never directly asked whether the tapes themselves accurately reflected his conversations with Dr. Sanchez. Nonetheless, his testimony is susceptible to the interpretation that the *transcriptions* accurately reflected the conversations. In turn, Hill testified that the transcriptions accurately reflected the content of the tapes, with the exception of minor details that did not alter the meaning of their content. He added that the duplicate tapes were accurate copies of the originals and that he recognized his voice and that of Dr. Sanchez on the tapes. Officer Hill also explained how his patrol car and telephone had been equipped with microphones that transmitted to recording devices and that he had worn a recording device during his conversations with Dr. Sanchez. Further, during his testimony regarding the conversations, Hill continually referenced the fact that they had been taped. We conclude that the ALJ did not abuse its discretion in concluding that the original and duplicate audiotapes, as well as the transcriptions, were accurate representations of Officer Hill's conversations with Dr. Sanchez. We overrule Sanchez's fifth issue.

**Burden of proof**

We next address Sanchez's claim that, because his alleged conduct was a criminal offense, the Board should have been held to a higher burden of proof than "preponderance of the evidence." Sanchez insists that the Board should have been required to prove its allegations by "clear and convincing evidence" or "beyond a reasonable doubt." Sanchez additionally argues that

15

because medical disciplinary proceedings are "penal in nature," due process requires a higher standard of proof than a "mere preponderance of the evidence."

This Court has previously observed that "agency license-revocation proceedings are civil in nature," and "that in civil cases 'no doctrine is more firmly established than that issues of fact are resolved by a preponderance of the evidence.'" *Granek v. Texas State Bd. of Med. Exam'rs*, 172 S.W.3d 761, 777 (Tex. App.—Austin 2005, no pet.) (quoting *Pretzer v. Motor Vehicle Bd.*, 125 S.W.3d 23, 38-39 (Tex. App.—Austin 2003), *aff'd in part and rev'd in part*, 138 S.W.3d 908 (Tex. 2004)). In *Granek*, we squarely rejected the contention that due process requires a higher burden of proof in license revocation proceedings, and noted that "Texas applies the clear and convincing standard in civil cases only in 'extraordinary circumstances,' such as civil commitment hearings and involuntary termination of parental rights." *Id*. We continue to regard this analysis as persuasive. Nor does Sanchez suggest any reason why, in a licensing proceeding, an allegation of conduct constituting a criminal offense should, for that reason alone, be subject to a higher standard of proof than an allegation of non-criminal conduct. *Cf. Heiligmann v. Ross*, 16 S.W. 931, 931 (Tex. 1891) ("There is no force in the position that because the facts of the case may involve a criminal act there should be a greater or more certain degree of proof than is required in other civil actions."); *see also State v. Gray*, 175 S.W.2d 224, 225 (Tex. 1943) (in civil forfeiture proceeding, issue of whether property owner had committed offense of "exhibiting slot machines for the purpose of gaming . . . had to be determined only from a preponderance of the evidence, not beyond a reasonable doubt.").

Sanchez also relies upon our characterization of the Board's licensing proceedings

16

as "civil" to argue that the ALJ abused its discretion in admitting evidence of Sanchez's nolo contendere plea in violation of article 27.02 of the code of criminal procedure. Article 27.02 provides that a plea of nolo contendere "may not be used against the defendant as an admission in any civil suit based upon or growing out of the act upon which the criminal prosecution is based." Tex. Code Crim. Proc. Ann. art. 27.02(5) (West 2007). The ALJ agreed, holding that Sanchez's plea was inadmissible as an admission of guilt, although the order of deferred adjudication was admissible on other grounds. We accordingly assume that the ALJ did not rely on the plea as evidence of Sanchez's guilt. *See Herford v. State*, 139 S.W.3d 733, 735 & n.7 (Tex. App.—Fort Worth 2004, no pet.). We overrule Sanchez's third issue.

**Substantial evidence**

Dr. Sanchez next asserts that the Board's fact findings—7, 10, 11, and 12—supporting its legal conclusions regarding disciplinary grounds are not supported by substantial evidence.[10]

---

[10] Restated here for the reader's convenience:

7.  During this [initial October 6, 2000] meeting between Dr. Sanchez and Officer Hill, Dr. Sanchez indicated to Officer Hill that he wanted M.G. killed. Officer Hill told Dr. Sanchez that he had to think about his request and would contact Dr. Sanchez later.

. . . .

10.  Officer Hill's testimony and the tape recorded conversations between Dr. Sanchez and Officer Hill establish by a preponderance of the evidence that Dr. Sanchez solicited Officer Hill to kill M.G.

11.  Dr. Sanchez agreed to pay Officer Hill $20,000 to kill M.G.

17

The APA authorizes courts to "test the agency's findings, inferences, conclusions, and decisions to determine whether they are reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole." *Texas Dep't of Pub. Safety v. Latimer*, 939 S.W.2d 240, 244 (Tex. App.—Austin 1997, no pet.) (citing *Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex. 1984)). We are to presume that the agency decision is supported by substantial evidence, and Sanchez has the burden of overcoming that presumption. *Granek*, 172 S.W.3d at 778 (citing *Charter*, 665 S.W.2d at 452). We may not substitute our judgment for that of the agency, and may consider only the record on which the agency based its decision. *Id.* We consider only the reliable and probative evidence in this record. *See* Tex. Gov't Code Ann. § 2001.174(2)(E) (West 2004).

The crux of a substantial evidence analysis is whether the agency's factual findings are reasonable "in light of the evidence from which they were purportedly inferred." *Granek*, 172 S.W.3d at 778 (citing John E. Powers, *Agency Adjudications* 163 (1990)). Substantial evidence does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion of fact. *Hinkley v. Texas State Bd. of Med. Exam'rs*, 140 S.W.3d 737, 743 (Tex. App.—Austin 2004, pet. denied). The evidence in the record may actually preponderate against the agency's decision and nevertheless amount to

---

On October 7, 2000, Dr. Sanchez paid Officer Hill $8,000 cash as a partial payment of the agreed price. Dr. Sanchez agreed to pay Officer Hill the balance of $12,000 after M.G. was killed.

12.     Dr. Sanchez solicited Officer Hill to murder M.G.

substantial evidence. *Latimer*, 939 S.W.3d at 244. The agency determines the meaning, weight, and credibility to assign conflicting evidence, *Texas State Bd. of Med. Exam'rs v. Scheffey*, 949 S.W.2d 431, 437 (Tex. App.—Austin 1997, pet. denied), and we may not set aside an agency decision because testimony was conflicting or disputed or because it did not compel the agency's decision. *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1996). We are ultimately concerned with the reasonableness of the agency's order, not its correctness. *See id*.

A court reviewing an agency action "shall reverse and remand the cause to the agency when substantial rights of the appellant have been prejudiced by an agency's findings that are not reasonably supported by substantial evidence considering the reliable evidence in the record as a whole." *Hinkley*, 140 S.W.3d at 743; *see* Tex. Gov't Code Ann. § 2001.174(2)(E). A trial court's ultimate determination whether substantial evidence supports an agency's order is a question of law, which we review de novo. *Texas Dep't of Pub. Safety v. Jackson*, 76 S.W.3d 103, 106 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

We have previously summarized the reliable and probative evidence in the record. Several key facts tending to support the ALJ's findings were undisputed: Dr. Sanchez and Officer Hill met several times under circumstances that could reasonably be considered suspicious, Sanchez avoided informing Sappington about his dealings with Hill even though Sappington and Hill were good friends, Sanchez paid Hill $8,000, and this payment was for purposes that included Hill's purchase of a gun.

Hill also testified unequivocally that after he explained legal procedures for

19

addressing M.G.'s threats, Sanchez told him that "he didn't want anything like that done," told Hill "perhaps he could get a gun," and said, "boom, boom, boom," while holding his hand up as if he was holding a gun. During subsequent meetings, Hill testified, Sanchez discussed the need for Hill to purchase an unregistered gun and told him that the act needed to be done on a particular night when Sanchez would be "visible" with his friends. At their final meeting, Hill recounted that Sanchez asked if there was a picture to confirm that the act had been done and agreed to pay Hill more money for completing the act. Hill also testified that he repeatedly used the term "kill" to describe the act he was planning to commit on M.G. and that Sanchez never suggested there had been a misunderstanding.

Although Sanchez offered controverting evidence, the ALJ could reasonably have concluded that Hill's version of the conversations was more plausible. Sanchez's account begs the questions, for example, why he would pay for Hill to purchase an unlicensed gun and to ensure such secrecy if their objective was to have M.G. arrested, deported, or intimidated, and why he would want a photo, except to see the body. In any event, we must resolve evidentiary ambiguities in favor of the administrative order with a finding of substantial evidence to support the ALJ's decision. *Railroad Comm'n v. Torch Operating Co.*, 912 S.W.2d 790, 792 (Tex. 1995).

We conclude that substantial evidence supports the challenged findings. We overrule Sanchez's second issue.

**Are the fact findings sufficient to support the Board's disciplinary grounds?**

Dr. Sanchez asserts that fact findings 7, 10, 11, and 12 cannot, as a matter of statutory construction, support the Board's conclusion that he "committed unprofessional or dishonorable

20

conduct that is likely to . . . injure the public" under section 164.052(a)(5) without additional findings or conclusions establishing that his acts were "related to professional dereliction in the practice of medicine or conduct under the cloak of medical treatment."

Statutory construction presents questions of law that we review de novo. *Bragg v. Edwards Aquifer Auth.*, 71 S.W.3d 729, 734 (Tex. 2002); *Edwards Aquifer Auth. v. Chemical Lime, Ltd.*, 212 S.W.3d 683, 697 (Tex. App.—Austin 2006, pet. filed). In construing a statute, our objective is to determine and give effect to the legislature's intent. *Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 176 (Tex. 2004); *see also* Tex. Gov't Code Ann. § 312.005 (West 2005). We ascertain that intent "first and foremost" from the statute's language as written. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). We must consider the statute as a whole, not individual provisions in isolation, and we should not give one provision a meaning out of harmony or inconsistent with other provisions, even though it might be susceptible to such a construction standing alone. *Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002); *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 866 (Tex. 1999).

The Medical Practice Act establishes the Board as an agency of the executive branch "with the power to regulate the practice of medicine." Tex. Occ. Code Ann. § 152.001 (West Supp. 2006). "Practicing medicine" is defined as "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions, by a person who (A) publicly professes to be a physician or surgeon; or (B) directly or indirectly charges money or other compensation for those services." *Id.*

21

§ 151.002(a)(13) (West Supp. 2006). The Board is empowered to adopt rules and bylaws as necessary to "regulate the practice of medicine in this state" and "enforce this subtitle." *Id*. § 153.001 (West 2004). It is also empowered to refuse to admit prospective licensees to its examination, to refuse to issue licenses, and "to take disciplinary action against a person" based on grounds enumerated in section 164.051 of the occupations code. *See id*. § 164.051(a). Some of these grounds are certain acts committed within the practice of medicine. *See id*. § 164.051(a)(6) ("fails to practice medicine in an acceptable professional manner consistent with public health and welfare."), (7) (peer review or hospital disciplinary action when Board finds that action was based on "unprofessional conduct or professional incompetence that was likely to harm the public"), (8) ("is subject to repeated or recurring meritorious health care liability claims that in the board's opinion evidence professional incompetence likely to injure the public"). Other grounds, however, concern traits of fitness or character that may impact—directly or indirectly—the person's ability to practice medicine. *See id*. § 164.051(a)(2) (conviction of felony or misdemeanor involving moral turpitude), (4) ("is unable to practice medicine with reasonable skill and safety to patients because of (A) illness; (B) drunkenness; (C) excessive use of drugs, narcotics, chemicals, or another substance; or (D) a mental or physical condition"), (5) ("is found by a court judgment to be of unsound mind").

Section 164.051 also includes among the grounds for denial or disciplinary action the commission of "an act prohibited under Section 164.052." *See id.* § 164.051(a)(1). Section 164.052 enumerates several "prohibited practices" by "[a] physician or an applicant for a license." *See id.* § 164.052(a). Many of these grounds involve deception in taking a medical examination,

22

obtaining a license, or in the representing or holding forth of the licensing status of oneself or one's affiliates. *See id*. § 164.052(a)(1)-(3), (6)-(15), (17). However, "prohibited practices" also include "us[ing] alcohol or drugs in an intemperate manner that, in the board's opinion, could endanger a patient's life," *id*. § 164.052(4), and "committ[ing] unprofessional or dishonorable conduct that is likely to deceive or defraud the public, as provided by Section 164.053, or injure the public." *Id*. § 164.052(5). They also include performing or procuring, or aiding or abetting the procurement of a "criminal abortion," or attempting such acts. *Id*. § 164.052(16).

Section 164.053, in turn, defines "unprofessional or dishonorable conduct likely to deceive or defraud the public" "[f]or purposes of Section 164.052(a)(5)." *Id*. § 164.053(a). The definition "includes conduct in which a physician . . . commits an act that violates any state or federal law if the act is connected with the physician's practice of medicine." *Id*. § 164.053(a)(1). As the Board observes, the plain language of section 164.052(a)(5) incorporates the limitations and definitions of section 164.053 only with regard to "unprofessional or dishonorable conduct that is likely to deceive or defraud the public." *Id*. § 164.052(a)(5) ("committ[ing] unprofessional or dishonorable conduct that is likely to deceive or defraud the public, as provided by Section 164.053, or injure the public."). Conversely, section 164.053 defines only "unprofessional or dishonorable conduct *likely to deceive or defraud the public*" under section 164.052(a)(5). *Id*. § 164.053 (emphasis added). Neither provision purports to limit "unprofessional or dishonorable conduct likely to . . . *injure the public*." Thus, read in isolation, nothing in either section 164.052(a)(5) or section 164.053 would prevent "an act that violates any state . . . law" that is *not* "connected with the physician's practice of medicine" from constituting "unprofessional or dishonorable conduct likely

23

to . . . injure the public." *See id*. §§ 164.052(a)(5), .053(a)(1).

Dr. Sanchez, however, points out that section 164.052 refers to "prohibited *practices*" and that the term "practice" or "practices" throughout the Medical Practice Act refers to the practice of medicine. *See id.* §§ 151.001 (subtitle may by cited as "the *Medical Practice* Act"), .002(12) (defining "physician" as "person licensed to *practice medicine* in this state."), .002(13) (defining "practicing medicine"); 164.052(a) ("physician or license applicant commits a *prohibited practice* if . . . .") (emphases added). From this statutory context, Sanchez urges us to infer legislative intent that the "prohibited practice" of "unprofessional or dishonorable conduct that is likely to . . . injure the public" refers solely to acts or conduct committed within or under the guise of his practice of medicine.

Dr. Sanchez also emphasizes that the legislature specifically enumerated certain types of criminal violations that could serve as bases for Board discipline—and that these do not include his violation. As previously noted, section 164.053 includes violations of state and federal law "if the act is connected with the physician's practice of medicine" among the acts constituting "unprofessional or dishonorable conduct likely to deceive or defraud the public" under section 164.052(a)(5). Sanchez also observes that section 164.051, at relevant times, included as a disciplinary ground only *convictions* for felonies and misdemeanors involving moral turpitude, and did not encompass his order of deferred adjudication. Act of May 13, 1999, 76th Leg., R.S., ch. 388, § 1, 1999 Tex. Gen. Laws 1431, 1517 (amended 2003) (current version at Tex. Occ. Code Ann.

§ 164.051(a)(2) (West 2004)).[11] Sanchez contends that by specifying only these types of criminal violations that could be a basis for Board discipline, the legislature manifested intent to preclude the use of other criminal violations as a basis for discipline, and that this specific intent must control our construction of section 164.052(a)(5)'s more general "unprofessional or dishonorable conduct that is likely to . . . injure the public."

We disagree with Dr. Sanchez's construction of "unprofessional or dishonorable conduct that is likely to . . . injure the public" under section 164.052(a)(5). Under the provision's plain language, the act of soliciting murder is one "likely to . . . injure the public," and Sanchez does not challenge the Board's fact finding that conduct likely to result in the death of M.G. is "likely to injure the public." Nor is there any serious dispute that such an act is "dishonorable" under any ordinary meaning of that term, if not also "unprofessional."[12]

We also conclude that the Medical Practice Act, construed as a whole, does not manifest legislative intent to strictly limit section 164.052's "prohibited practices" solely to acts or conduct committed within or in the guise of medical practice. To the contrary, section 164.052

---

[11] As noted previously, this provision was subsequently amended to include being "convicted of, *or is placed on deferred adjudication, community supervision or deferred disposition for* a felony or misdemeanor involving moral turpitude." Act of May 23, 2003, 78th Leg., R.S., ch. 202, § 31, 2003 Tex. Gen. Laws 841, 841 (emphasis added).

We also note that the Board adopted a rule in 2003—after Sanchez's alleged conduct was committed—providing that unprofessional and dishonorable conduct that is likely to deceive, defraud, or injure the public within the meaning of the Act includes the commission of a felony, whether or not there is a complaint, indictment, or conviction. 28 Tex. Reg. 10496 (2003) (codified at 22 Tex. Admin. Code § 190.8(2)(S)(i) (2006)) (proposed Sept. 5, 2003). The rule does not require that the commission of the felony be connected to the practice of medicine.

[12] Before the ALJ, Sanchez argued that the term "unprofessional" denoted that the act must be connected to the practice of medicine. Sanchez does not advance this view on appeal.

reflects a broader intent to prevent unqualified or otherwise unfit individuals from practicing medicine. Many of the "prohibited practices" concern fraud or misconduct by license *applicants* in obtaining a license, *see* Tex. Occ. Code Ann. § 164.052(a)(1)-(3), (8), (11), (12); misrepresentation of a person's licensing status or medical credentials, *id*. § 164.052(a)(9), (10), (13)-(15), (17); and false or misleading advertising. *Id.* § 164.052(a)(6), (7). Other "prohibited practices" include using alcohol or drugs in an "intemperate manner that, in the board's opinion, could endanger a patient's life." *Id*. § 164.052(a)(4). These "prohibited practices," while obviously concerned with preventing unqualified or unfit persons from actually harming individual patients, also reflect a broader legislative intent to ensure public trust and confidence that it is safe to seek care from Texas physicians. These dual concerns are also reflected in the other disciplinary grounds enumerated in section 164.051. *See id.* § 164.051(2) (conviction of felony or crime involving moral turpitude), (4) (illness, drunkenness, excessive drug use, or "a mental or physical condition" rendering person "unable to practice medicine with reasonable skill and safety"), (5) ("found by a court judgment to be of unsound mind").[13]

The Board acted consistently with this legislative intent in concluding that Sanchez's solicitation of M.G.'s murder is "unprofessional or dishonorable conduct that is likely to . . . injure the public." Even if not directly related to his practice of medicine, Sanchez's acts serve to undermine public trust and confidence in the safety of Texas medicine, if not manifesting behaviors

---

[13] We also note that section 164.057 requires the Board to suspend a physician's license on proof that the physician has been initially convicted of a felony. Tex. Occ. Code Ann. § 164.057 (West 2004). Likewise, section 164.058 provides that, "[r]egardless of the offense," the Board shall suspend the license of a physician serving a prison term in a state or federal penitentiary during the term of incarceration. *Id*. § 164.058 (West 2004).

26

that would actually endanger patients. Although we can foresee cases where the Board conceivably could "stretch" the application of section 164.052(a)(5) beyond its permissible bounds, as Sanchez contends occurred here, a physician's solicitation of capital murder is not one of them.[14]

Finally, we are not persuaded by Dr. Sanchez's contention that the legislature's specific inclusion of certain types of criminal violations as Board disciplinary grounds evidences intent to limit the scope of other, independent disciplinary grounds—such as unprofessional or dishonorable conduct likely to injure the public—where such conduct also constitutes a criminal violation. Sanchez's logic would imply that the legislature's inclusion of excessive drunkenness and drug usage as both a section 164.051 disciplinary ground and a section 164.052(a) "prohibited practice" are limited to that which results in a criminal conviction. *See* Tex. Occ. Code Ann. §§ 164.051(a)(1), (4), .052(a)(4).

We hold that the Board's fact finding that Dr. Sanchez solicited M.G.'s murder is sufficient as a matter of law to support its conclusion of law 3, "Based on Finding of Fact No. 12, Dr. Sanchez committed unprofessional and dishonorable conduct that was likely to injure the public, in violation of Tex. Occ. Code § 164.052(a)(5)." This conclusion, in turn, supports the Board's conclusion of law 4, "Tex. Occ. Code § 164.051 and 164.52(a)(5) authorize the Board to discipline Dr. Sanchez for his unprofessional and dishonorable conduct that was likely to injure the public." We overrule Dr. Sanchez's first and sixth issues.

---

[14] We express no opinion regarding the application of section 164.052(a)(5) beyond the facts presented here.

**The Board's modification of the ALJ's PFD**

Sanchez also claims that the Board violated the APA in deleting the ALJ's conclusion of law 5, which, as previously discussed, stated that "Dr. Sanchez's solicitation of murder of M.G. did not occur while Dr. Sanchez was engaged in the practice of medicine, as the term is defined in Tex. Occ. Code 151.002(a)(13)." An agency may modify an ALJ's order or change an ALJ's finding of fact or conclusion of law only if the agency determines that: (1) the ALJ improperly applied or interpreted the law, agency rules or policies, or prior administrative decisions; (2) the ALJ based his decision on a prior administrative decision that is incorrect; or (3) a finding of fact contains a technical error requiring correction. Tex. Gov't Code Ann. § 2001.058(e). The agency is required to explain with particularity its specific reason and legal basis for each change made. *Granek*, 172 S.W.3d at 780-81. The agency must "articulate a rational connection between an underlying agency policy and the altered finding of fact or conclusion of law." *Levy v. Texas State Bd. of Med. Exam'rs*, 966 S.W.2d 813, 815 (Tex. App.—Austin 1998, no pet.).

Our disposition of Sanchez's first and sixth issues also defeats his contention here. As earlier noted, the Board explained that conclusion of law 5 was unnecessary to support the disciplinary ground on which the Board had ultimately relied—that Dr. Sanchez had committed unprofessional and dishonorable conduct that was likely to injure the public—and did not accurately reflect agency policy. We agree that, in light of the Board's other findings and conclusions, conclusion of law 5 was unnecessary. It was within the Board's discretion to delete it, and it did so in compliance with section 2001.058(e). *See Pierce v. Texas Racing Comm'n*, 212 S.W.3d 745, 753 (Tex. App.—Austin 2006, pet. filed); F. Scott McCown & Monica Leo, *When Can an Agency*

28

*Change the Findings or Conclusions of an Administrative Law Judge?*, 50 Baylor L. Rev. 65, 86

(1998)**[15]**; *see also* Tex. R. App. P. 44.1.  We overrule Sanchez's fourth issue.

## CONCLUSION

Having overruled Dr. Sanchez's issues on appeal, we affirm the judgment of the

district court.


_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Henson

Affirmed

Filed:   June 27, 2007

---

**[15]**   *See also Smith v. Montemayor*, No. 03-02-00466-CV, 2003 Tex. App. LEXIS 5099, at *26-27 (Tex. App.—Austin June 19, 2003, no pet.) (mem. op.).