# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00154-CV

**James T. Jongebloed, Appellant**

**v.**

**Texas Lottery Commission, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
### NO. D-1-GN-03-004825, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is an administrative appeal in which James T. Jongebloed challenges a district court judgment affirming an order of the Texas Lottery Commission denying his application for a refund of $42,863.89 that the Commission had seized from his personal bank account. This amount, the parties agree, represented lottery sales proceeds owed to the Commission by a limited liability company that had been a licensed lottery sales agent. The dispositive issue on appeal is whether substantial evidence supports the Commission's determination that Jongebloed had been an "officer" or "director" of the company at the time its liability accrued so as to make him personally liable for the obligation. *See* Tex. Gov't Code Ann. § 466.353(b) (West 2004). Concluding that substantial evidence of that fact is lacking, we will reverse the district court's judgment and the Commission's order.

**BACKGROUND**

Petro Express Management, LLC (PEM), a Texas limited liability company, held licenses from the Commission authorizing it to sell Texas Lottery tickets in various convenience stores and gas stations that it owned. *See* Tex. Gov't Code Ann. §§ 466.151-.152 (West 2004). The lottery act requires that such licensees hold in trust the State's share of their ticket sale proceeds, *see id.* at § 466.453 (West 2004), and the act and Commission rules provide for collection of these amounts through electronic fund transfers to the State treasury, *see id.* § 466.351 (West 2004); *see also* 16 Tex. Admin. Code § 401.351 (2009) (providing for weekly "sweep" of sales agents' bank accounts). On June 5, 2002, when the Commission made its usual weekly electronic "sweep" of PEM's bank account to collect the State's share of its lottery sales proceeds, the account contained insufficient funds to cover the amount due. Three additional sweeps of PEM's account that month yielded the same result. Commission staff began summary license-suspension proceedings against PEM, *see* Tex. Gov't Code Ann. § 466.160 (West 2004); 16 Tex. Admin. Code § 401.159 (2009), and PEM's lottery sales machines were turned off on July 1, 2002, *see* 16 Tex. Admin. Code § 401.158 (2009). The record reflects that these developments coincided with PEM's financial demise and that the company went out of business shortly thereafter.

Following a public hearing that no PEM representative attended, the Commission issued an October 16, 2002 final order revoking PEM's lottery sales license. According to Commission records, the final balance owed by PEM was $42,862.63.

In November 2002, without prior notice, the Commission froze Jongebloed's personal bank account. It subsequently filed a lien on the account and seized the amount of funds that

2

PEM owed the State—$42,862.63. In taking these actions, the Commission acted under color of section 466.353(b) of the lottery act. Section 466.353(b) provides that, with reference to the portions of lottery sales proceeds that a sales agent is required to hold in trust for the State's benefit:

> If the sales agent is not an individual, each officer, director, or owner of the sales agent is personally liable to the division for the full amount of the money or unsold tickets held in trust for the benefit of the state.

Tex. Gov't Code Ann. § 466.353(b). The Commission took the position that Jongebloed was personally liable under section 466.353(b). In fact, PEM's most recent sales agent license renewal application, filed in 2001, had indicated that Jongebloed was a "vice president" of PEM.

Jongebloed filed an administrative claim for a refund of the seized amount, and requested a contested-case hearing. *See* Tex. Gov't Code Ann. § 466.019 (West 2004); Tex. Tax Code Ann. §§ 111.104-.105 (West 2008). The Commission referred the matter to the State Office of Administrative Hearings (SOAH). A contested-case hearing was held before an administrative law judge (ALJ) on April 9, 2003. The parties contested two principal sets of issues. First, Jongebloed denied that he had been an "officer, director, or owner" of PEM when the company's liability accrued in June 2002. He presented evidence that he had severed any ties with PEM in September 2000 and that any PEM filings to the contrary were in error. Second, Jongebloed urged that even if he had been an "officer, director, or owner" of PEM during the relevant time period, that fact alone would be an insufficient basis for imposing personal liability under section 466.353(b). He observed that section 466.019 of the lottery act delegates to the Commission's executive director "the administrative, enforcement, and collection powers" that

3

the comptroller possesses under title 2, subtitle B of the tax code, treating lottery sale proceeds the same as a tax, *see* Tex. Gov't Code Ann. § 466.019,[1] and that title 2, subtitle B contains the following provision:

Sec. 111.016. PAYMENT TO THE STATE OF TAX COLLECTIONS.

(a)     Any person who receives or collects a tax or any money represented to be a tax from another person holds the amount so collected in trust for the benefit of the state and is liable to the state for the full amount collected plus any accrued penalties and interest on the amount collected.

(b)     With respect to tax or other money subject to the provisions of Subsection (a), an individual who controls or supervises the collection of tax or money from another person, or an individual who controls or supervises the accounting for and paying over of the tax or money, and who wilfully fails to pay or cause to be paid the tax or money is liable as a responsible individual for an amount equal to the tax or money not paid or caused to be paid. The liability imposed by this subsection is in addition to any other penalty provided by law. The dissolution of a corporation, association, limited liability company, or partnership does not affect a responsible individual's liability under this subsection.

*     *     *

---

[1] Section 466.019 provides in full:

The executive director has the administrative, enforcement, and collection powers provided by Subtitle B, Title 2, Tax Code, in regard to the lottery. For purposes of the application of Title 2 of the Tax Code:

(1) the state's share of proceeds from the sale of lottery tickets is treated as if it were a tax; and

(2) a power granted to the comptroller may be exercised by the Commission.

Tex. Gov't Code Ann. § 466.019 (West 2004).

(d)     In this section:

    (1)     "Responsible individual" includes an officer, manager, director, or employee of a corporation, association, or limited liability company or a member of a partnership who, as an officer, manager, director, employee, or member, is under a duty to perform an act with respect to the collection, accounting, or payment of a tax or money subject to the provisions of Subsection (a).

Act of Apr. 28, 1995, 74th Leg., R.S., ch. 87, § 1, 1995 Tex. Gen Laws 872, 872 (amended 2007) (current version at Tex. Tax Code Ann. § 111.016)). Jongebloed reasoned that section 466.019 incorporates the tax code's "responsible person" limitation into the enforcement provisions of the lottery act. Characterizing his involvement in PEM as that of merely a passive investor, Jongebloed contended that the Commission had no authority to hold him personally liable for PEM's obligations.

Following the hearing, the ALJ issued a proposal for decision (PFD), with proposed findings of fact and conclusions of law, recommending that the Commission deny Jongebloed's refund claim. Jongebloed filed exceptions to the PFD, in response to which the ALJ recommended no changes. During an open meeting on September 11, 2003, the Commission adopted the ALJ's proposed findings and conclusions in their entirety and issued a final order denying Jongebloed's refund claim. Jongebloed timely filed a motion for rehearing, which the Commission denied by written order on November 23, 2003.

Jongebloed timely filed a petition for judicial review of the Commission's final order in district court. Following arguments on February 20, 2008, the district court issued a final judgment affirming the Commission's order. This appeal followed.

5

## ANALYSIS

Jongebloed brings three issues on appeal. In substance, he complains that the district court erred in affirming the Commission's order because the record contains neither substantial evidence that he was an "officer, director, or owner" of PEM at the time the company's liability arose, *see* Tex. Gov't Code Ann. § 466.353(b), nor any findings or evidence that he was a "responsible individual" with regard to PEM's liability, *see* Tex. Tax Code Ann. § 111.016(a), (d).

### Standard of review

Our review of the Commission's final order is governed by the "substantial evidence" standard of the Administrative Procedures Act. Under this standard, we may not substitute our judgment for that of the Commission on the weight of the evidence on questions committed to agency discretion. Tex. Gov't Code Ann. § 2001.174 (West 2008). However, we must reverse and remand the Commission's order if Jongebloed's substantial rights have been prejudiced because the Commission's findings, inferences, conclusions, or decisions (1) violate a constitutional or statutory provision; (2) exceed the Commission's statutory authority; (3) were made through unlawful procedure; (4) were affected by other error of law; (5) are not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or (6) are arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. *Id.* § 2001.174(2). In sum, we review agency fact findings for support by substantial evidence, review legal conclusions for errors of law, and the proper test is whether the evidence in its entirety is such that reasonable minds could have reached the conclusion that the agency must have

6

reached to justify its decision or whether the agency acted arbitrarily and without regard to the facts. *H.G. Sledge, Inc. v. Prospective Inv. & Trading Co., Ltd.*, 36 S.W.3d 597, 602 (Tex. App.—Austin 2000, pet. denied).

The Commission's order is presumed valid, and Jongebloed bears the burden of showing a lack of substantial evidence. *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1994); *Sportscoach Corp. of Am. v. Eastex Camper Sales, Inc.*, 31 S.W.3d 730, 733 (Tex. App.—Austin 2000, no pet.). The substantial-evidence inquiry operates in the context of the APA's requirement that agencies enter written conclusions of law and findings of fact that support their final decisions and that such findings, "if set forth in statutory language, must be accompanied by a concise and explicit statement of the underlying facts supporting the findings." Tex. Gov't Code Ann. § 2001.141(b), (d) (West 2008). The crux of a substantial-evidence analysis is whether the agency's findings of underlying fact are reasonable in light of the evidence from which they were purportedly inferred. *Granek v. Texas State Bd. of Med. Exam'rs*, 172 S.W.3d 761, 778 (Tex. App.—Austin 2005, no pet.); John E. Powers, *Agency Adjudications* 163-64 (1990).

Substantial evidence does not mean "a large or considerable amount of evidence;" rather, substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' of fact." *Lauderdale v. Texas Dep't of Agric.*, 923 S.W.2d 834, 836 (Tex. App.—Austin 1996, no writ) (quoting *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988) and *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The evidence in the record may preponderate against the agency's decision and still provide a reasonable basis for the decision to satisfy the substantial-evidence standard. *Id.* (citing *Nucor Steel v. Public Util. Comm'n*, 168 S.W.3d

7

260, 267 (Tex. App.—Austin 2005, no pet.)). The fact-finder—here, the ALJ—determines the credibility of witnesses and the weight to give their testimony. *See Granek*, 172 S.W.3d at 778. We may not set aside an agency decision merely because testimony was conflicting or disputed, or because it did not compel the agency's decision. *Sanchez v. Texas State Bd. of Med. Exam'rs*, 229 S.W.3d 498, 510 (Tex. App.—Austin 2007, no pet.) (citing *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1996)). Ultimately we are concerned not with the correctness of the agency's order, but with its reasonableness. *Id*.

Whether the Commission's order was supported by substantial evidence is a question of law. *Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 562 (Tex. 2000). The district court's judgment is thus not entitled to deference on appeal. *Texas Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006) (per curiam). On appeal of that judgment, we consider the same question presented to the district court: whether the Commission's order was supported by substantial evidence. *See Montgomery*, 34 S.W.3d at 562.

**"Officer, director, or owner"?**

The validity of the Commission's order depends on whether Jongebloed was an "officer, director, or owner" of PEM in June 2002, so as to be "personally liable for the full amount of the money . . . [PEM] held in trust for the benefit of the state" under section 466.353(b) of the lottery act. *See* Tex. Gov't Code Ann. § 466.353(b). The Commission's ultimate finding or conclusion on that issue is its conclusion of law 12, in which it determined that, "As a member,

8

director, and manager of PEM when lottery proceeds became due, Petitioner [Jongebloed] is personally liable to the Commission for the proceeds."[2] Underlying that conclusion are three sets of fact findings.

The first set, findings 1-7, concern Jongebloed's involvement in PEM's predecessor, a limited partnership, and in PEM upon its 1999 conversion to a limited liability corporation:

1.  On March 1, 1999, the partners and officers of Petro Express Ltd., a limited partnership, filed an application for a lottery sales agent's license with the Texas Lottery Commission (Commission).

2.  As stated in the application, James T. Jongebloed (Petitioner), Richard Stinson, William Bobbora, and four other persons were limited partners and each owned 18.67% or less of the partnership. Petroplex Petroleum, LLC, was the general partner with a 20% interest.

3.  Petitioner signed the application and submitted his fingerprints and other required information.

4.  Petro Express, Ltd., was granted lottery sales agent license 460200.

5.  Five months later, Mr. Stinson, on behalf of the partnership, filed an application to sell lottery tickets at additional outlets.

6.  On October 29, 1999, Petro Express Management, Ltd., the licensee, was converted to Petro Express Management, LLC, a limited liability company (PEM).

7.  In PEM's articles of organization, Petitioner is listed as one of the company's three initial managers.

Thus, the Commission found that Jongebloed was a limited partner in PEM's predecessor and one of PEM's "three initial managers" at its 1999 inception. Generally speaking, a limited liability

---

[2] The Commission had quoted the provisions of section 466.353 in its conclusion of law 4.

corporation is governed by one or more "managers," similar to directors in a business corporation. *See* Tex. Rev. Civ. Stat. Ann. art. 1528n § 2.12 (West Supp. 2008).

Jongebloed does not appear to challenge findings 1-7. Furthermore, although section 466.353(b) of the lottery act does not explicitly include "managers" among the categories of relationships with a sales-agent licensee that can be a basis for personal liability, Jongebloed does not appear to contend that a manager of a limited liability company would be excluded from the statutory categories of "officer, director, or owner" for that reason alone.

The second and third sets of findings concern whether Jongebloed continued to be involved in PEM through June 2002, when the company's liability accrued. Jongebloed, who had retired from full-time work in 1999, testified that he had severed all ties with PEM in 2000. William Bobbora, PEM's president (and also Jongebloed's son-in-law), corroborated Jongebloed's claim that he had resigned from PEM in 2000. Also in evidence were articles of amendment to PEM's articles of organization (essentially the LLC equivalent of a corporation's articles of incorporation[3]) dated September 1, 2000, and made effective on that date, designating Bobbora as the company's sole manager. Jongebloed also relied on an undated "resolution of the managing member," signed by Bobbora as the company's sole managing member and secretary, stating the following:

1. James T. Jongebloed verbally informed the Company that he has resigned as a Managing Member, Director, and as a Manager of the Company effective September 1, 2000 (the "Resignation").

---

[3] *See* Tex. Rev. Civ. Stat. Ann. art. 1528n § 3.02 (West Supp. 2008).

2.	Mr. Jongebloed's Resignation was accepted and recognized by the Company effective September 1, 2000.

3.	Article III, Section 3.2 of the Regulations of the Company (the "Regulations") is amended as follows:

	"The initial Managers specified in the articles of organization shall serve as Managers, until such time as a change in the Managers is made by vote of the Members as set forth herein. The number of Managers shall be (1) one, unless a different number is approved by vote of the Members as set forth herein."

4.	As such, it is recognized, and approved that William R. Bobbora is the Managing Member of the Company.

On the other hand, the Commission presented evidence that even after September 1, 2000, PEM, under Bobbora's direction, had filed documents with the Commission or other state agencies indicating that Jongebloed was continuing to serve as a manager of PEM or even as an officer. This included PEM's most recent sales agent license renewal application, filed in 2001, which reflected that Jongebloed was a "vice president" of the company. In response, Jongebloed did not dispute the fact that PEM made these filings (and other similar ones) with various state agencies, but presented evidence that their identification of him as being an officer, manager, or as otherwise involved with PEM was in error. He testified that he had no involvement in preparing the filings and no knowledge that his name was being included in them. Jongebloed added that his involvement in PEM had been "strictly as an investor and I never had any day-to-day operational duties." Bobbora, the sole signatory on the filings, agreed that the filings erroneously identified Jongebloed as a manager or officer of PEM. He offered an explanation for the errors.

11

During the period in which the filings were made, Bobbora explained, he was struggling to perform duties formerly handled by Richard Stinson, a limited partner in PEM's predecessor and an original PEM manager. According to Bobbora:

> Mr. Stinson, who had controlled every aspect of the company, corporate records, accounting, organizational structure, had just left on a very confrontational manner. So I was completely green and was just being led by my keepers . . . All I can say it was a living hell, and the interim comptroller and was trying to clean up loose ends that Mr. Stinson left behind, and I was signing stacks of documents trying to get the house cleaned up.

Bobbora further elaborated that he was traveling "across the state" in connection with his job responsibilities at the time, and had trusted in his employees to prepare the filings—even to the extent that he had his staff overnight or fax him only the filings' signature pages, which he then signed and returned without ever reading the rest of the documents. There was evidence consistent with the filings having been prepared by someone copying incorrect or outdated information from prior filings. This included a 2001 PEM franchise tax report, which identified the company's name as that of PEM's predecessor (the limited partnership that had ceased to exist in 1999) and other filings incorrectly identifying Stinson as a company officer even after his departure. Bobbora suggested that PEM employees made similar errors in regard to Jongebloed's involvement.

The Commission also emphasized evidence that Bobbora's "resolution of the managing member" was not submitted to the Commission until January 9, 2003, when Jongebloed's counsel, responding to the seizure of his client's bank account, faxed a copy to the Commission's counsel.

12

Based on this evidence, the Commission made the following findings in regard to the PEM's post-September 2000 filings:

8. In order to remain licensed, a lottery sales agent must complete a renewal application for the lottery sales agent's license.

9. On March 27, 2001, Petitioner's son-in-law, William Bobbora, filed a renewal application for the lottery sales agent's license.

10. The renewal application indicates that Petitioner was PEM's vice president as of March 2001.

11. Mr. Bobbora signed a franchise tax record that was filed with the Comptroller of Public Accounts on May 13, 2001, and listed Petitioner as one of three managers of Petro Express Management, Ltd., the previous name for the company.

The Commission also made the following findings regarding the testimony that Jongebloed had resigned from PEM in September 2000 and Bobbora's "resolution of the managing member":

20. Even though Petitioner and Mr. Bobbora said Petitioner resigned from PEM effective September 1, 2000, the resolution evidencing the resignation was not submitted to the Commission until January 9, 2003.

21. Petitioner's resignation was not effective until after lottery proceeds became due to the Commission.

On appeal, Jongebloed does not appear to challenge findings 8-11 and 20, but disputes that these facts and the record considered as a whole can reasonably support the Commission's finding 21 (that his resignation from PEM "was not effective until after lottery proceeds became due") or its ultimate

13

determination in conclusion of law 12 that he was "a member, director, and manager of PEM when lottery proceeds became due." As this case has been presented to us on appeal, we agree with Jongebloed.

We first observe that the Commission's findings, on their face, do not support its legal conclusion that Jongebloed was a "member . . . of PEM when lottery proceeds became due." Membership in an limited liability corporation is an "interest in personal property" akin to stock ownership or a partnership interest. *See* Tex. Rev. Civ. Stat. Ann. art. 1528n § 4.04 (West Supp. 2008). Although the Commission made findings to the effect that Jongebloed had been identified on PEM filings as a vice president (i.e., an "officer") and manager (i.e., essentially the equivalent of a "director") of the company, it made no finding that Jongebloed was ever a member of PEM. Being a manager or officer of a limited liability company does not mean that one is also a member. Managers of a limited liability company may be, but are not necessarily, members, and managers do not by that status alone have a membership interest in the entity. *Id.* §§ 2.12, 4.04. The same is true of officers of a limited liability company. *Id.* §§ 2.21(A). The Commission, in fact, concedes in a post-submission brief that Jongebloed's "liability did not stem from being an 'owner'" of PEM, but his purported status as an "officer or director." Consequently, Jongebloed's personal liability, if any, must rest upon findings that he was a PEM "officer" or "director" in June 2002.

During the SOAH hearing, the Commission seemed to question the veracity or credibility of Jongebloed and Bobbora's evidence regarding the timing of Jongebloed's resignation from PEM and Bobbora's claims of errors in the company's filings. In addition to emphasizing PEM's post-September 2000 filings and the fact that Bobbora's "resolution of the managing

14

member" memorializing Jongebloed's resignation had not been submitted to the Commission until after it had seized the funds from Jongebloed's bank account, the Commission relied on evidence that PEM had filed no documents with the State before July 2002 reflecting Jongebloed's resignation.[4]  On appeal, however, the Commission has taken the position that the ALJ *credited* Jongebloed and Bobbora's evidence that Jongebloed had resigned from PEM in 2000, but the order nonetheless must be upheld because "[a]s found by the ALJ, Jongebloed's verbal resignation had no effect until reduced to writing and submitted to the Lottery Commission."[5]  In other words, the Commission's position on appeal is that even though Jongebloed had, in fact, resigned from PEM in September 2000, his resignation "was not effective until after lottery proceeds became due to the Commission" (finding 21) because no written record of that resignation was

_____

[4] The Commission emphasized evidence that the articles of amendment to PEM's articles of association, dated and effective September 1, 2000, were not filed with the secretary of state until July 15, 2002.  Similarly, the Commission pointed to a July 9, 2002, franchise tax public information report, signed by Bobbora as PEM's managing member, that was the first such report reflecting that he was the company's sole officer and manager.

[5] The Commission points to the following statements by the ALJ in its PFD:

Although Petitioner and Mr. Bobbora appeared to be forthright in their testimony about Petitioner's severing ties with PEM in 2000, the documentary evidence is more persuasive.  Mr. Bobbora had at least two opportunities in 2001 to amend corporate documents, with the lottery renewal application and the franchise tax record, but he did not do so.  Further, Mr. Bobbora did not file amended articles of incorporation with the Secretary of State until July 15, 2002, almost two years after he said Petitioner had resigned.  Even if Petitioner had verbally withdrawn from PEM, neither Petitioner nor Mr. Bobbora took any affirmative action to inform members of the public or governmental entities that relied on accurate company information.  Therefore, the ALJ finds that Petitioner was a member, manager, and director of PEM when the lottery proceeds became due in June 2002.

15

provided to the Commission until January 2003 (finding 20).[6] Consequently, it reasons, Jongebloed remained "a . . . director, and manager of PEM when lottery proceeds became due" (conclusion of law 12) for purposes of section 466.353(b).

The Commission's position is predicated on a view that the meaning of "officer" and "director" under section 466.353(b) of the lottery act is impacted by whether a licensee complies with section 466.153 of the act. Section 466.153 provides that "an applicant or sales agent shall notify the director of any change in the applicant's or sales agent's most recent application for a license or renewal of a license . . . not later than the 10th day after the date of the change." Tex. Gov't Code Ann. § 466.153(a) (West 2004). Among the information that sales agent licensees and applicants are required to provide in license applications is the identity of their "officers" and "directors" if the licensee or applicant is not an individual. *See id.* §§ 466.152(a), .155 (West 2004). Consequently, if a sales agents licensee's "officers" or "directors" change, section 466.153 would require the licensee to notify the Commission of that fact within ten days. The Commission adds that "[t]he gravity of this obligation is underscored by section 466.311," which makes it a criminal offense to fail to maintain or make an entry the person knows is required to be maintained or made in a license application, book, or record. *See id.* § 466.311 (West 2004). The gravamen of the

_____

[6] In what it terms a "side note" in a post-submission brief, the Commission, for the first time, questions the effectiveness of Jongebloed's resignation under the Texas Limited Liability Company Act. It suggests that "Texas law generally provides for effective resignations or withdrawals to be in writing." We cannot discern any support for that proposition in the act or the PEM documents in the record. The Act includes no requirement that a manager's resignation be in writing. *See* Tex. Rev. Civ. Stat. Ann. art.1528n §§ 2.13 ("Number and Election of Managers"), 2.23 ("Voting, Quorum, and Action") (West Supp. 2008); *cf. id.* § 2.06(D) (requiring written resignation of limited liability company's registered agent). In any event, Jongebloed's resignation was memorialized in the written "resolution of the managing member."

16

Commission's argument is that because a sales agent is required to notify the Commission promptly of changes in its officers and directors, a former officer or director of a sales agent remains subject to personal liability under section 466.353(b) following his or her resignation—i.e., still an "officer" or "director" for purposes of that section—unless and until the sales agent notifies the Commission of the resignation as required by section 466.153.

The validity of the Commission's argument turns on the meaning of "officer" and "director" under section 466.353(b) and, specifically, whether there is any relationship between those terms and the notice provisions on which it relies. This is a question of statutory construction. Statutory construction presents a question of law that we review de novo. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2004).[7] Our primary objective in statutory construction is to give effect to the legislature's intent. *See id.* at 284. We seek that intent "first and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). "When text is clear, text is determinative of that intent." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009) (op. on reh'g) (citing *Shumake*, 199 S.W.3d at 284 and *Alex Sheshunoff Mgmt. Servs. v. Johnson*, 209 S.W.3d 644, 651-52 (Tex. 2006)). We rely on the plain meaning of the text, unless a different meaning is supplied by legislative definition or is apparent from context, or unless such a construction leads to absurd results. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008) (citing *Texas Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004); *Taylor v. Firemen's & Policemen's Civil Serv. Comm'n*, 616 S.W.2d 187, 189

---

[7] We reject the Commission's attempt to characterize this issue as a fact question turning on whether the "documentary evidence supporting Jongebloed's status as an officer, owner, or director was more persuasive" than Jongebloed's evidence.

17

(Tex. 1981); *University of Tex. Sw. Med. Ctr. v. Loutzenhiser*, 140 S.W.3d 351, 356 (Tex. 2004)); Tex. Gov't Code Ann. § 311.011 (West 2005) ("[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage," but "[w]ords and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly"). We should also read every word, phrase, and expression in a statute as if it were deliberately chosen, and likewise presume that words excluded from the statute are done so purposefully. *See Gables Realty Ltd. P'ship v. Travis Cent. Appraisal Dist.*, 81 S.W.3d 869, 873 (Tex. App.—Austin 2002, pet. denied). Our analysis of the statutory text is also informed by the presumptions that "the entire statute is intended to be effective" and that "a just and reasonable result is intended," Tex. Gov't Code Ann. § 311.021(2) & (3) (West 2005), and consideration of such matters as "the object sought to be attained," "circumstances under which the statute was enacted," legislative history, and "consequences of a particular construction," *id*. § 311.023(1), (2), (3), (5) (West 2005). However, only when the statutory text is ambiguous "do we 'resort to rules of construction or extrinsic aids.'" *Entergy Gulf States, Inc.*, 282 S.W.3d at 437 (quoting *In re Estate of Nash*, 220 S.W.3d 914, 917 (Tex. 2007)).

With regard to a statute that an agency is charged with enforcing, we give "serious consideration" to the agency's construction of it, so long as that construction is reasonable and consistent with the statutory language, and this is particularly true when the statute involves complex subject matter within the agency's area of expertise. *See First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008). On the other hand, we "do not defer to administrative interpretation in regard to questions which do not lie within administrative expertise or deal

18

with a nontechnical question of law." *Rylander v. Fisher Controls Int'l, Inc.*, 45 S.W.3d 291, 302 (Tex. App.—Austin 2001, no pet.).

Regardless of whether we apply the plain meaning of "officer" or "director" as used in section 466.353(b) or a technical meaning that such terms may have acquired in the law of business entities, the terms would normally exclude a person, like Jongebloed, who had resigned his position almost two years before the relevant events occurred. We find nothing in the text or structure of section 466.353(b), section 466.153, or the lottery act as a whole that evidences legislative intent to deviate from that meaning based on a sales agent's non-compliance with section 466.153's notice requirement. The two provisions do not cross-reference each other, and they serve different purposes within the lottery act.

Section 466.153 appears in subchapter D of the act, which imposes the requirement that lottery tickets be sold only by sales agents licensed by the Commission and regulates how and to whom the agency issues a license, when a license expires, and when a license may be suspended or revoked. *See* Tex. Gov't Code Ann. §§ 466.151-.161 (West 2004 & Supp. 2008). Subchapter D is prospective in nature: it regulates who is authorized to sell lottery tickets from the present going forward. By requiring that licensees and applicants notify the Commission whenever information submitted on previous applications has changed, the legislature's evident purpose in section 466.153 is to ensure that the Commission has accurate and up-to-date information concerning licensees or prospective licensees when regulating whether that person should be permitted to sell lottery tickets.[8]

---

[8] Section 466.311, the criminal penalty provision, appears in subchapter G of the act, which is essentially a "laundry list" of various offenses in connection with the sale of lottery tickets. *See* Tex. Gov't Code Ann. §§ 466.3011-.313 (West 2004).

19

Section 466.353(b), in contrast, appears in subchapter H of the lottery act, which governs the revenue aspects of lottery ticket sales by licensed sales agents. *See id.* §§ 466.351-.359 (West 2004); *see also id.* § 466.002(9) ("'[s]ales agent' or 'sales agency' means a person licensed under this chapter to sell tickets"). Included in this subchapter are provisions defining the State's share of revenues generated by a sales agent's lottery ticket sales, *see id.* §§ 466.358-.359, the State's permitted uses of such revenues, *see id.* §§ 466.355(b), (c), .357, provisions holding the sales agent responsible as a trustee of the State's share of sales revenues and unsold tickets, *see id.* § 466.353(a), and means through which the Commission administers and enforces collection of sales agents' obligations to the State. *See id.* §§ 466.351-.355(a). Among these means of collection and enforcement is section 466.353(b)'s provision making "each officer, director, or owner of the sales agent" personally liable to the Commission for the sales agent's obligations when the agent is not an individual. With respect to a sales agent's obligations, subchapter H is retrospective in nature: it imposes financial responsibility on a sales agent and each of its "officers," "directors," or "owners" for lottery tickets the agent has previously sold or accepted.

From this statutory scheme, we cannot discern that the legislature intended the notice requirement of section 466.153 to have any relationship to the "officers," "directors," or "owners" against whom a sales agent's financial obligations can be enforced under section 466.353(b). We thus find no support for the Commission's construction of section 466.353(b) to mean that a sales agent's "officers, directors, and owners" who can be held personally liability under section 466.353(b) includes *former* officers, directors, or owners if notice of such an individual's resignation from the company is not provided to the Commission under section 466.153.

Consequently, any failure by PEM to notify the Commission of Jongebloed's resignation could not, as a matter of law, have caused him to remain a PEM "officer" or "director" subject to personal liability under section 466.353(b).

Given the Commission's position crediting evidence that Jongebloed, in fact, resigned from PEM in 2000 and the absence of any finding that he was ever a member of PEM, its finding 21 that Jongebloed's "resignation was not effective until after lottery proceeds became due to the Commission" and its conclusion 12 that "[a]s a member, director, and manager of PEM when lottery proceeds became due, [Jongebloed] is personally liable to the Commission for the proceeds" are not supported by substantial evidence. Consequently, the Commission's order denying Jongebloed's refund claim must be reversed and the cause remanded to the agency. *See* Tex. Admin. Code § 2001.174 (West 2008). As the Commission failed to meet its burden to prove Jongebloed was a PEM "officer, director, or owner," we need not address Jongebloed's contentions that it was also required to prove he was a "responsible individual" under tax code section 111.016. *See* Tex. R. App. P. 47.1

**CONCLUSION**

We reverse the district court's judgment affirming the Commission's order and remand the matter to the Commission for further proceedings consistent with this opinion.

21

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Reversed and Remanded

Filed:   August 31, 2009