# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00507-CV

**Texas Department of Family and Protective Services, Appellant**

**v.**

**Jennifer Jean Drozd and the State Office of Administrative Hearings, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
NO. D-1-GN-08-004209, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

After the Texas Department of Family and Protective Services (the Department) denied appellee Jennifer Jean Drozd's application for a non-expiring permit to operate a child-care facility, Drozd requested a contested-case hearing before the State Office of Administrative Hearings (SOAH). The Department has ceded the final decision in such matters to SOAH. *See* Tex. Gov't Code Ann. § 2001.058(f) (West 2008); 40 Tex. Admin. Code §§ 745.353, .8849 (2010). Following the hearing, a SOAH administrative law judge (ALJ) overturned the Department's denial and ordered that it issue Drozd the permit. The Department sought judicial review of the ALJ's order in the district court, which affirmed the order. The Department now appeals the district court's judgment to this Court. In three issues, the Department urges that the ALJ's order is not supported by substantial evidence because the ALJ's ultimate findings or conclusions are not supported by its

underlying fact findings, because the ALJ relied on legally impermissible factors, and because the ALJ's decision is arbitrary, capricious, and unreasonable. We will affirm the district court's judgment.

## BACKGROUND

Because the Department's appellate issues arise in the context of Texas's statutory and regulatory regime governing child-care facilities, it is helpful to begin with a brief summary of pertinent features of that regime. Under chapter 42 of the human resources code, the legislature has charged the Department with regulating "child-care facilities" in the state. *See generally* Tex. Hum. Res. Code Ann. §§ 42.041-.078 (West 2001 & Supp. 2010); *see also id*. § 42.002(3) (West Supp. 2010) (defining "child-care facility"). Among other regulatory responsibilities, the legislature required the Department to "make rules to carry out the provisions of this chapter," establish complaint procedures, promulgate various required forms, and "promulgate minimum standards that apply to licensed child-care facilities . . . and that will: (1) promote the health, safety, and welfare of children attending a facility . . . ; (2) promote safe, comfortable, and healthy physical facilities . . . for children; (3) ensure adequate supervision of children by capable, qualified, and healthy personnel; (4) ensure adequate and healthy food service where food service is offered; (5) prohibit racial discrimination by child-care facilities . . . ; (6) require procedures for parental and guardian consultation in the formulation of children's educational and therapeutic programs; and (7) prevent the breakdown of foster care and adoptive placement." *Id*. § 42.042(e). The Department has since promulgated by rule several thousand "minimum standards" for child-care facilities

that address everything from clerical and record-keeping requirements, to detailed specifications regarding the physical condition of the facilities, to qualifications and continuing education for the facilities' personnel, to the sorts of activities that are deemed appropriate for particular age groups. *See generally* 40 Tex. Admin. Code §§ 746.101-.5621 (2010). These minimum standards are found in chapter 746 of title 40, Texas Administrative Code, which is titled, "Minimum Standards for Child-Care Centers." *See id.*

The legislature has also imposed a general requirement that any person operating a child-care facility must have a Department-issued license. *See id*. § 42.041(a). The legislature has mandated that the Department "shall issue a license after determining that an applicant has satisfied all requirements," and that the license "must be issued if the department determines that a facility meets all requirements." *Id*. § 42.048(a), (e). If these requirements are not met, the Department has discretion to deny the license, although it is not required to. *Id*. § 42.072(a) (Department "may" deny license to child-care facility that "does not comply with the requirements of this chapter [or] the standards and rules of the department"); *see also* Tex. Gov't Code Ann. § 311.016(1)-(3) (West 2005) (When used in codes, "'[s]hall' imposes a duty" and "'[m]ust' creates or recognizes a condition precedent," while "'[m]ay' creates discretionary authority or grants permission or a power.").

The Department's rules governing licensing of child-care facilities are found in chapter 745 of title 40, Texas Administrative Code. *See generally* 40 Tex. Admin. Code §§ 745.1-.9161 (2010). These rules provide that the Department issues child-care facility operators either a "non-expiring" permit or an "initial permit" (also termed an "initial license"). 40 Tex. Admin. Code § 745.341. A non-expiring permit remains effective so long as the permit holder pays required

3

licensing fees; the facility remains at the same location and under the same ownership; the permit is not suspended, revoked, or surrendered; and the permit holder "compl[ies] with the minimum standards, rules and statutes." *Id*. § 745.343. Chapter 745 defines "minimum standards" in relevant part to include "[t]he rules contained in . . . 746 of this title (relating to Minimum Standards for Child-Care Centers) . . . which are minimum requirements for permit holders that are enforced by DFPS to protect the health, safety, and well-being of children." *Id*. § 745.21(25).

An "initial permit" or license, by contrast, is effective for six months, subject to renewal up to an additional six months. *Id*. § 745.347. The Department "must issue" an initial permit when the applicant meets the Department's "Licensing minimum standards, rules, and statutes," and (1) the facility is not currently in operation "but meet[s] the appropriate minimum standards, except those with which compliance cannot be determined in the absence of children"; (2) the facility is operating but not currently licensed; (3) the facility has relocated and has made changes to the types of child-care services it provides; (4) an existing licensee has applied for a license for another type of child care; or (5) there is a change in ownership of the facility resulting in changes in policy and procedure or in the staff who have direct contact with the children. *Id*. § 745.345. An applicant "will be eligible for a non-expiring permit when: (1) [the applicant's] initial permit has been in effect for at least three months; (2) [the applicant has] met all licensing minimum standards on a continuing basis; (3) the Licensing staff has made three inspections, unless supervisory approval is obtained to make fewer visits; and (4) [the applicant has] paid [her] non-expiring license fee." *Id*. § 745.351. Although chapter 745 defines "minimum standards" to include the "minimum standards for child-care centers" contained in chapter 746, it does not specify the meaning of "the *appropriate* minimum standards" in section 745.345 or "*licensing* minimum

4

standards" in sections 745.345 or 745.351, nor does it explain what it means to meet "all licensing minimum standards *on a continuing basis*" under section 745.351.

Consistent with the underlying statutory framework, chapter 745 affords discretion to the Department to deny a license if an applicant fails to satisfy all of the requirements for securing a mandatory right to the license, but does not require it to deny the license. The Department "may make recommendations and/or impose remedial action for any deficiency." *Id*. § 745.8601. Among the Department's potential "remedial actions" for a "deficiency" are the denial or revocation of a license, which are classified as "adverse" "remedial actions." *See id*. §§ 745.8601, .8603(2), .8651(1). A "deficiency" is defined in relevant part as "[a]ny failure to comply with a standard, rule, [or] law . . . ." *Id*. § 745.21(13). The rules additionally provide that the Department "can impose a remedial action any time we find" certain specified deficiencies or patterns of deficiencies. *Id*. § 745.8605. These include, among others, "[a] single serious deficiency of minimum standards, rules, or laws, including a finding of abuse or neglect or background check matches," "[s]everal deficiencies that create an endangering situation," "[a] repetition or pattern of deficiencies," and "[the applicant] or someone working at [her] operation refuses, prevents, or delays [the Department's] ability to conduct an inspection and/or investigation." *Id*. § 745.8605(5), (6), (7), (9).

The Department decide[s] to take remedial actions based upon an assessment of the following:

(1)     The severity of the deficiency;

(2)     Whether the deficiency has been repeated;

(3)     Whether the deficiency can be corrected;

5

(4)    How quickly the correction can be made . . . ;

(5)    Whether [the applicant] demonstrate[s] responsibility for compliance with minimum standards, rules, and laws;

(6)    Whether conditions must be imposed to avoid further deficiencies;

(7)    [The applicant's] compliance history; and

(8)    The degree and/or immediacy of danger or threat of danger posed to the health or safety of children.

*Id*. § 745.8607.

Appellee Drozd purchased a Burnet child-care facility, the Pumpkin Patch Learning Center, in March 2007. Drozd had been Pumpkin Patch's director since November 2, 2006, and also owned and was the director of a San Saba child-care facility from May 2002 to December 2007. Title to Pumpkin Patch transferred on Wednesday, March 7, 2007. On that day, Pumpkin Patch opened for business as usual, with 47 children attending during the day. Although Pumpkin Patch had operated for many years under the prior owner's license and Drozd had been licensed to operate the San Saba child-care facility herself, Drozd did not obtain a license to operate Pumpkin Patch prior to opening on March 7. Drozd claimed that a Department inspector had assured her and the prior owner that it was "no big deal" if Drozd opened before obtaining the required license rather than closing for the day until the license was obtained (and displacing the children and parents who relied on Pumpkin Patch as one of only two child-care facilities in Burnet). However, on March 7, a different Department inspector appeared at Pumpkin Patch and cited Drozd for operating without a license. The inspector also cited Drozd for nine other violations of "minimum standards" under

6

chapter 746, five of which related to record-keeping[1] and four of which were "health and safety" violations—a torn nap mat and torn diaper-changing mat (which, the ALJ found, both referred to a single mat) and a caregiver's failure to wash her hands and a child's hands after changing a diaper. Nonetheless, the inspector helped Drozd correct each of the cited deficiencies and the Department issued Drozd an initial license on the same day.

Over the next five months, the Department conducted six more unannounced inspections at Pumpkin Patch and cited Drozd for thirty-one additional deficiencies. Only one deficiency—pertaining to documentation of employees' first-aid training—was cited twice. Fourteen of the thirty-one cited violations pertained to documentation violations—including one citation for having an employee list that was not the same size as the "minimum standards" required.[2] Eight more cited deficiencies concerned "health and safety" standards—one instance on April 3 when a caregiver failed to wash her hands and those of a child before giving snacks (Drozd indicated this occurred on a playground), a July 9 citation for having hand sanitizer and diaper-changing supplies accessible to children, July 9 citations for having a missing electrical outlet cover and an exposed

---

[1] Specifically, "no proof of first aid training," "no first aid guide," "failure to update infant feeding schedules," "no documentation of breakfast substitutes," and "no documentation of one employee's pre-service training."

[2] Drozd was cited for violating the documentation requirement related to employees' first-aid training on April 3 and August 14. It was also on April 3 that Drozd was cited for having an employee list of the wrong size and for omitting one employee on the list. In addition to these deficiencies, Drozd was cited on July 9 for failure to maintain a "monthly playground checklist." On August 14, Drozd was cited for not having "release information" in four children's records, not having school telephone numbers in three children's records, having "incomplete" health statements in two children's records, and not having on file educational information for six caregivers, proof of pre-service training for two caregivers, a "required affidavit" for one caregiver, proof of first-aid training for two caregivers, a background request for one substitute caregiver, and a personnel record for one substitute caregiver.

nail on the playground, and July 30 citations for having napping equipment blocking a doorway and one teacher supervising two classrooms.

The remaining nine cited deficiencies involved more serious incidents of neglect or abuse of children by Pumpkin Patch personnel or failures to report incidents when children were placed at risk. On May 31, 2007, a Pumpkin Patch caregiver who was taking twelve children ages 6-8 on a field trip to the movies in a van stopped at her apartment to get money and left the children out of her sight, unattended, and with the van's motor running for more than one minute while she went inside. When this incident occurred, Drozd was on vacation. When she returned, Drozd, the ALJ found, met with the caregiver, instructed her that leaving the children in the van had put them at serious risk, informed all employees that leaving children in a van was not acceptable, and moved the caregiver to another position where she would not be alone with or responsible for any child. The caregiver subsequently resigned from Pumpkin Patch. Based on this incident, the Department cited Pumpkin Patch for the caregiver's neglect and lack of good judgment for leaving the children alone in the van, as well as for the caregiver's leaving the van without counting the children.

Subsequently, on Friday, July 6, 2007, another Pumpkin Patch caregiver, accompanied by his mother as a volunteer, took a group of Pumpkin Patch children to a local swimming pool. Although the two supervisors plus two lifeguards were monitoring the pool, one of the children, E, unnoticed, went into the deeper end of the pool, let go of the side of the pool, and went under water. Eventually, another child noticed that E was at the bottom of the pool, and a third child, age 12, pulled E from the bottom to the pool's side. By this time, E's face was blue and purple and his eyes were wide open. A lifeguard began rescue breathing, the caregiver called 911

8

and then Pumpkin Patch, and paramedics arrived shortly thereafter. E was revived and stabilized, and flown by helicopter to an Austin hospital. He survived without harm and continued to attend Pumpkin Patch.

The ALJ found that this incident had occurred around 1 p.m. and that personnel from the Burnett County Sheriff's Office, with whom Drozd had spoken shortly after the incident, had instructed her not to contact E's parents to inform them of the incident but to allow the sheriff's office to do so first. Drozd provided the sheriff's office personnel contact numbers for E's parents. Drozd did, however, eventually speak to E's father at around 5 p.m. that day. On the following Monday morning, Drozd reported the incident to a Department investigator who was at Pumpkin Patch for a regularly scheduled visit. The Department subsequently cited Pumpkin Patch for not immediately reporting the incident to E's parents and for not reporting the incident to the Department within 48 hours (a period that had expired during the intervening weekend).

Finally, the Department cited Pumpkin Patch in connection with a July 13, 2007 incident in which an employee had placed a child's feces-covered fingers into his mouth. At the time, Drozd was away from the facility and had left in charge the same employee, who had worked there for over five years, was the most senior employee, had been highly recommended by the prior owner, and had worked for Drozd without incident for five months. After Drozd returned on July 18, she was eventually notified of the abuse incident by another employee on July 20. Drozd investigated the allegation and, after determining that the abuse did in fact occur, fired the offending employee and informed the child's parents of the incident. However, Drozd did not report the incident to the Department until July 30. Based on the incident, the Department cited Pumpkin Patch

9

for abuse and lack of good judgment, as well as failure to timely report suspected abuse to the Department.

By letter dated September 10, 2007, the Department advised Drozd of its intent to impose the "adverse action" of denying her application for a non-expiring permit to operate Pumpkin Patch. The letter cited the Department's discretionary authority under human resources code section 42.072(a) and rule 745.8605. *See* Tex. Hum. Res. Code Ann. § 42.072(a) (Department "may" deny a license to a child-care facility that "does not comply with the requirements of this chapter [or] the standards and rules of the department"); 40 Tex. Admin Code § 745.8605 (Department "can impose a remedial action any time we find" certain specified deficiencies or patterns of deficiencies). In such an instance, the human resources code and Department rules entitled Drozd to request an APA contested-case hearing before SOAH to determine "whether [the] Licensing decision or action was appropriate." *See* Tex. Hum. Res. Code Ann. § 42.072(b); 40 Tex. Admin. Code §§ 745.8831, .8833, .8835(4), (7), .8837-.8845. Such a decision is final with SOAH. *See* Tex. Gov't Code Ann. § 2001.058(f); 40 Tex. Admin. Code §§ 745.353, .8849. The Department's rules, furthermore, allowed Drozd to first request an "administrative review," or informal evaluation by the Department's own staff "to determine whether a Licensing decision or action was appropriate." *See* 40 Tex. Admin. Code §§ 745.8801-.8817. After unsuccessfully pursuing an "administrative review," Drozd requested a hearing before SOAH. Following the hearing, the ALJ concluded that the Department's denial of Drozd's application for a non-expiring permit to operate Pumpkin Patch should be overturned and that the Department should issue the permit.

10

While finding that each of the deficiencies for which Pumpkin Patch had been cited had in fact occurred—an issue that Drozd did not dispute—the ALJ found that the Department's denial of Drozd's non-expiring permit "is not warranted" in light of the factors listed in rule 745.8607 that guide the Department's exercise of discretion in deciding to take "remedial action." *See id*. § 745.8607. With respect to each of the deficiencies, the ALJ made fact findings addressed to the rule 745.8607 factors. The ALJ found that Drozd had no prior history of violations, *see id.* § 745.8607(7) (applicant's "compliance history"), and that Pumpkin Patch's thirty-one health, safety and documentation violations did not "present[] a significant risk of immediate danger to the health or safety of children," *see id.* § 745.8607(1) ("severity of the deficiency"), (8) ("degree and/or immediacy of danger or threat of danger posed to the health or safety of children"); *cf. id.* § 745.8605(5) (not including such violations in examples of "serious" deficiencies), that Drozd "took responsibility" for these violations, *see id.* § 745.8607(5) ("demonstrate[s] responsibility for compliance with minimum standards, rules, and laws"), that these violations were "quickly corrected," *see id.* § 745.8607(3), (4) (whether "deficiency can be corrected" and "[h]ow quickly"), and that only one such violation had been repeated, *see id.* § 745.8607(2) ("[w]hether the deficiency has been repeated"). Based on these findings, the ALJ concluded that denying Drozd's permit based solely on these violations "would be too harsh a sanction for violations that did not place a child at immediate and significant risk and did not recur, with one minor exception that did not recur a third time."

Regarding the licensing violation on March 7, the ALJ concluded that while this was a "serious deficiency," it was "not one for which the permit should be denied." In support, the ALJ found that the Department ultimately issued Drozd an initial license within the same day,

that this fact demonstrated that "operating a facility on the day of purchase but before a license is issued is not a violation for which the Department always denies a license," that "[o]perating without a permit for one day did not pose any danger or threat of danger to the health or safety of children," and that "[c]losing the Facility for a day would have been very inconvenient for Pumpkin Patch's customers" as "[t]here was only one other child-care facility in Burnet." *See id.* § 745.8607(1)-(4), (8).

As for the incident when a caretaker left children in a van, the ALJ found that the act exposed the children "to the risk of serious physical injury," was "not reasonable," constituted "neglect" under chapter 746, and demonstrated a "profound lack of judgment" in violation of chapter 746. The ALJ observed that neglect is classified as a "serious" deficiency under rule 745.8605(5). *See id.* § 745.8605(5) (Department "can impose a remedial action any time we find . . . [a] single serious deficiency of minimum standards, rules, or laws, including a finding of . . . neglect"). However, the ALJ found that Drozd had taken corrective action (including admonishing both the offending employee and other staff not to leave children in a van and moving the offending employee to another position in which she would not be alone with or responsible for any child), that the employee had resigned from Pumpkin Patch shortly thereafter, and that Drozd thus "took action to minimize the chance that this form of negligence would occur again." *See id.* § 745.8607(3), (4). The ALJ added that "the violation was due to a single employee suddenly doing something unexpected, contrary to policy and training, and foolish." He concluded that "[d]enial of a license and the loss of a business is not a reasonable remedy when an employee suddenly does something odd, illegal, contrary to policy and training; the owner is not complicit; and no child is significantly harmed." *See id.* § 745.8607(8).

12

Concerning the incident when a Pumpkin Patch supervisory employee placed a child's feces-covered fingers in his mouth, the ALJ found that this conduct constituted "abuse," was "quite severe," and placed the child "at physical risk." *See id.* §§ 745.8605(5), .8607(1), (8). However, the ALJ further found that Drozd "could not have anticipated or prevented the abuse of [the child] by [the employee]," who had been Pumpkin Patch's "most experienced employee," "highly" recommended by the prior owner, and had worked under Drozd's ownership for five months without incident. The ALJ also found that "[b]ecause the abuse was a one-time event, it could not be corrected," and that Drozd had "demonstrated responsibility for future compliance by firing [the employee] and reinstructing her staff to immediately notify her or the Department if they observed any abuse in the future." Based on these findings, the ALJ found that "[d]enial of a license and the loss of a business for the abuse of a child would be too severe a sanction for an owner whose seemingly extremely reliable employee suddenly, inexplicably, and bizarrely abused a child without the owner's knowledge, consent, presence, or creation or tolerance of circumstances that invited abuse." Additionally, concerning Drozd's failure to report the abuse promptly after discovering it, the ALJ found that she had not demonstrated responsibility for compliance with the reporting requirement, but also found that the Department's ability to conduct an investigation, while delayed, had not been prevented, and that Drozd had thereafter cooperated with Department investigators. Based on these findings, the ALJ concluded that "the failure to timely report the abuse . . . to the Department was a moderate violation because it was corrected, Ms. Drozd took steps to ensure that it did not recur, and the failure to report it did not significantly compromise the Department's investigation."

13

Finally, the ALJ found, in regard to the swimming incident, that the parent volunteer who had been watching the area of the pool where E went under had failed to "supervise" the child and that Drozd had failed to ensure that the volunteer was complying with minimum standards. However, the ALJ found that Pumpkin Patch had not been negligent, had maintained the required ratio of caregivers to children during the swimming trip, and that the failure to supervise was thus a "moderate" violation. The ALJ further concluded that "[s]tanding alone, the moderate violation of failing to supervise [E] while swimming should not lead to denial because there was no neglect and the accident happened despite imperfect but reasonable and multiple layers of supervision." Regarding the related reporting violations, the ALJ concluded that Drozd's failure to immediately call E's parents was "only a minor technical violation" because E received the care he needed, a law enforcement officer had instructed Drozd to let him call E's parents first, and the officer had contacted the parents as soon as they could be reached. As for reporting the incident to the Department within 48 hours, the ALJ found that "[n]o child was placed at risk by the failure to report [E's] swimming accident within 48 hours," that "[t]he afternoon of [E's] accident was extremely frightening and chaotic for the other children in Ms. Drozd's care, their parents, and her," that Drozd "had more important obligations on the afternoon of [E's] accident, especially caring for the other children, than calling the Department," that the Department's offices were closed over the intervening weekend anyway (and leaving a voice mail would have "accomplished nothing" because Drozd was already scheduled to meet a Department investigator Monday morning), and that this "minor" and "technical" violation had been "quickly corrected" at that time.

14

Based on these findings and conclusions, the ALJ further concluded that Pumpkin Patch had not committed several deficiencies that created an "endangering situation." *See id.* § 745.8605(6). The ALJ then made the following final conclusions:

51.	Based on the above Findings of Fact, denying Ms. Drozd's application for a permit would be a huge sanction. Since she cannot legally operate without a permit, denial would force Ms. Drozd to sell or liquidate her business. It could also force many parents with children in her care to find an alternative when there is only one other child-care facility in the community.

52.	Once an applicant has an initial permit, she is eligible for a non-expiring permit when:

a.	the initial permit has been in effect for at least three months,
b.	the applicant has met all minimum standards on a continuing basis,
c.	the Department's licensing staff has made at least three inspections, and
d.	the applicant has paid the non-expiring license fee. 40 TAC § 745.351.

53.	There is no dispute that the initial permit for Pumpkin Patch has been in effect for at least 3 months, the Department's licensing staff has made at least three inspections, and the applicant has paid the non-expiring license fee.

54.	Based on the above Findings of Fact and Conclusions of Law, the denial of Ms. Drozd's application for a permit is not warranted.

55.	Based on the above Findings of Fact and Conclusions of Law, the Department's denial of Ms. Drozd's application should be overturned and the Department should issue a non-expiring permit to Ms. Drozd.

The Department sought judicial review in the district court. The district court affirmed the ALJ's order. This appeal ensued.

15

## STANDARD OF REVIEW

Our review of the ALJ's final order is governed by the "substantial evidence" standard of the Administrative Procedures Act. Under this standard, we may not substitute our judgment for that of the ALJ on the weight of the evidence on questions committed to the ALJ's discretion. Tex. Gov't Code Ann. § 2001.174 (West 2008). However, we must reverse and remand the ALJ's order if the Department's substantial rights have been prejudiced because the ALJ's findings, inferences, conclusions, or decisions (1) violate a constitutional or statutory provision; (2) exceed the ALJ's statutory authority; (3) were made through unlawful procedure; (4) were affected by other error of law; (5) are not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or (6) are arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. *Id*. § 2001.174(2). In sum, we review the fact findings for support by substantial evidence, review legal conclusions for errors of law, and the proper test is whether the evidence in its entirety is such that reasonable minds could have reached the conclusion that the agency must have reached to justify its decision or whether the agency acted arbitrarily and without regard to the facts. *H.G. Sledge, Inc. v. Prospective Inv. & Trading Co., Ltd.*, 36 S.W.3d 597, 602 (Tex. App.—Austin 2000, pet. denied).

The ALJ's order is presumed valid, and the Department bears the burden of showing a lack of substantial evidence. *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1994); *Sportscoach Corp. of Am. v. Eastex Camper Sales, Inc.*, 31 S.W.3d 730, 733 (Tex. App.—Austin 2000, no pet.). The substantial-evidence inquiry operates in the context of the APA's requirement that agencies (or, in this case, the ALJ) enter written conclusions of law and findings of fact that support their final decisions and that such findings, "if set forth in

statutory language, must be accompanied by a concise and explicit statement of the underlying facts supporting the findings." Tex. Gov't Code Ann. § 2001.141(b), (d) (West 2008). The crux of a substantial-evidence analysis is whether the agency's findings of underlying fact are reasonable in light of the evidence from which they were purportedly inferred. *Granek v. Texas State Bd. of Med. Exam'rs*, 172 S.W.3d 761, 778 (Tex. App.—Austin 2005, no pet.); John E. Powers, *Agency Adjudications* 163-64 (1990).

Substantial evidence does not mean "a large or considerable amount of evidence"; rather, substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' of fact." *Lauderdale v. Texas Dep't of Agric.*, 923 S.W.2d 834, 836 (Tex. App.—Austin 1996, no writ) (quoting *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988) and *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The evidence in the record may preponderate against the agency's decision and still provide a reasonable basis for the decision to satisfy the substantial-evidence standard. *Id*. (citing *Nucor Steel v. Public Util. Comm'n*, 168 S.W.3d 260, 267 (Tex. App.—Austin 2005, no pet.)). The fact-finder—here, the ALJ—determines the credibility of witnesses and the weight to give their testimony. *See Granek*, 172 S.W.3d at 778. We may not set aside the ALJ's decision merely because testimony was conflicting or disputed, or because it did not compel the decision. *Sanchez v. Texas State Bd. of Med. Exam'rs*, 229 S.W.3d 498, 510 (Tex. App.—Austin 2007, no pet.) (citing *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1996)). Ultimately we are concerned not with the correctness of the ALJ's order, but with its reasonableness. *Id*.

Whether the ALJ's order is supported by substantial evidence is a question of law. *Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 562 (Tex. 2000). The district court's

judgment is thus not entitled to deference on appeal. *Texas Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006) (per curiam). On appeal of that judgment, we consider the same question presented to the district court: whether the ALJ's order is supported by substantial evidence. *See Montgomery*, 34 S.W.3d at 562.

**ANALYSIS**

In its first issue, the Department argues that the ALJ's decision is not supported by substantial evidence because the ALJ did not make an explicit finding or conclusion that Drozd has "met all licensing minimum standards on a continuing basis." 40 Tex. Admin. Code § 745.351. Section 745.351, as previously noted, provides that a license applicant "will be eligible for a non-expiring permit when: (1) [the applicant's] initial permit has been in effect for at least three months; (2) [the applicant has] met all licensing minimum standards on a continuing basis; (3) the Licensing staff has made three inspections, unless supervisory approval is obtained to make fewer visits; and (4) [the applicant has] paid [her] non-expiring license fee." *Id.* While the ALJ made explicit conclusions of law that the other three elements were not in dispute, he did not make an explicit conclusion as to whether Drozd had "met all licensing minimum standards on a continuing basis." Nor would substantial evidence support such a finding or conclusion, the Department adds, because the ALJ found (and Drozd conceded) each of the forty-one deficiencies for which she had been cited, nearly all of which were violations of chapter 746's minimum standards. Thus, the Department reasons, the ALJ's findings of underlying fact fail to support its ultimate findings or conclusions that Drozd had satisfied the statutory or regulatory requirements to obtain a non-expiring permit. *See Texas Health Facilities Comm'n v. Charter Medical-Dallas, Inc.*, 665 S.W.2d 446, 449-53

18

(Tex. 1984); *see also* Tex. Gov't Code Ann. § 2001.141(b) & (d) (West 2008) ("[U]ltimate findings" regarding whether statutory prerequisites to agency's action have been met that are "set forth in statutory language . . . must be accompanied by a concise and explicit statement of the underlying facts supporting the findings."). We disagree.

Whether the ALJ's underlying fact findings support its ultimate finding that Drozd should be awarded a non-expiring permit turns, in the first instance, on the statutory and regulatory standards that govern that decision. *See Charter Medical-Dallas, Inc.*, 665 S.W.2d at 449. Although satisfying the requirements of rule 745.351 would have entitled Drozd to a non-expiring permit, as previously suggested, the Department's decision whether to issue Drozd a permit despite violations of minimum standards was a matter of discretion, informed by the factors set forth in rule 745.8607. *See* 40 Tex. Admin. Code § 745.8607. In the present proceeding, the Department has ceded final authority over this discretionary decision to the ALJ. *See id*. § 745.8831 (hearing is "to determine whether a Licensing decision or action was appropriate"), .8849 ("The ALJ may uphold, reverse, or alter our [the Department's] decision or action. If he reverses our decision or action, then we must correct the decision or action in our records."). The ALJ made extensive findings applying the rule 745.8607 factors to the deficiencies that he found. These findings, in turn, support the ALJ's ultimate findings and conclusions that any deficiencies, singularly or in combination, did not warrant denying Drozd the permit. The ALJ was not "required to comment on every aspect of the record that may be relevant to its ultimate findings" or make findings on matters upon which it did *not* rely for support of its ultimate determinations. *State Banking Bd. v. Valley Nat'l Bank*, 604 S.W.2d 415, 419 (Tex. Civ. App.—Austin 1980, writ ref'd n.r.e.). We overrule the Department's first issue.

19

In its second issue, the Department complains that the ALJ's findings and conclusions demonstrate that he based his decision on "legally irrelevant" factors. In particular, the Department points to three of the ALJ's conclusions that, in the Department's view, demonstrate that the ALJ "treated the economic impact of denial of the permit as a paramount consideration in his analysis":

(1)     (with regard to the incident in which the now-former employee had left children unattended in a van) "Denial of a license and the loss of a business is not a reasonable remedy when an employee suddenly does something odd, illegal, contrary to policy and training; the owner is not complicit; and no child is significantly harmed";

(2)     (with regard to the incident in which a subsequently terminated employee had abused a child) "Denial of a license and the loss of a business for the abuse of a child would be too severe a sanction for an owner whose seemingly extremely reliable employee suddenly, inexplicably, and bizarrely abused a child without the owner's knowledge, consent, presence, or creation or tolerance of circumstances that invited abuse"; and

(3)      "Based on the above Findings of Fact, denying Ms. Drozd's application for a permit would be a huge sanction. Since she cannot legally operate without a permit, denial would force Ms. Drozd to sell or liquidate her business. It could also force many parents with children in her care to find an alternative when there is only one other child-care facility in the community."

The Department urges that the "true purpose" of chapter 42 of the human resources code is to protect the health, safety, and well-being of children, not "the economic interest of the license holder." In response, Drozd observes that her right to a SOAH hearing is rooted in her due-process right against arbitrary deprivations of her property—in fact, the Department's rules term such proceedings "due process hearings," *see* 40 Tex. Admin. Code §§ 745.8831-.8855—and urges that the Department's broad, discretionary standards for denying permits leave room for considering both the effect of a permit denial on both her individual operation and how its demise would impact the

20

larger community's access to quality child care. In any event, Drozd adds, the Department cannot show that the ALJ's decision turned on these factors, considering the record as a whole. We agree with Drozd, and overrule the Department's second issue.

Finally, in its third issue, the Department argues that the ALJ's decision is arbitrary, capricious, and unreasonable. In substance, the Department urges us to second-guess the ALJ's weighing of the evidence in applying the factors of rule 745.8607. We have previously summarized the ALJ's underlying fact findings and legal conclusions, and we hold that the Department has not met its burden to show that the ALJ's decision lacks a reasonable basis. *See Sanchez*, 229 S.W.3d at 510 (ultimately we are concerned not with correctness of ALJ's order but its reasonableness); *Lauderdale*, 923 S.W.2d at 836 (even if evidence in record preponderates against decision, it may still provide reasonable basis for decision). We overrule the Department's third issue.

## CONCLUSION

Having overruled the Department's issues, we affirm the district court's judgment affirming the ALJ's order.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Waldrop

Affirmed

Filed: August 12, 2010

21